**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 4 1997**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

TOBEY ANDERSON,

      Plaintiff - Appellee,

      v.

EXXON COAL U.S.A., INC., dba Carter Mining Company,

      Defendant - Appellant.

--------------------------------------------

THE INSTITUTE FOR A DRUG-FREE WORKPLACE,

      Amicus Curiae.

No. 96-8032

D. Wyoming

(D.C. No. 94-CV-1029-D)

---

**ORDER AND JUDGMENT**[*]

---

Before **ANDERSON**, **McWILLIAMS**, and **BRISCOE**, Circuit Judges.

---

Appellant, Exxon Coal U.S.A., Inc. (Exxon), terminated the employment of appellee Tobey Anderson, following a positive drug test. Ms. Anderson then brought this diversity suit against Exxon, alleging six causes of action under Wyoming law: (1)

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

breach of an implied employment contract; (2) promissory estoppel; (3) breach of the implied obligation of good faith and fair dealing; (4) negligence; (5) invasion of privacy; and (6) intentional infliction of emotional distress. The district court granted Exxon's motion for summary judgment on the negligence and intentional infliction of emotional distress claims. The remaining claims were tried to a jury. At the close of plaintiff's evidence, the district court granted Exxon's motion for judgment as a matter of law with respect to Ms. Anderson's invasion of privacy and breach of good faith and fair dealing claims. Ms. Anderson's breach of contract and promissory estoppel claims went to the jury, which found that Exxon breached an implied in fact contract with Ms. Anderson, and awarded her $416,800 in damages. Exxon filed a renewed motion for judgment as a matter of law, or in the alternative for a new trial or remittur. See Fed. R. Civ. P. 50(b). The district court denied the motion, and this appeal followed.

Exxon alleges that it was entitled to judgment as a matter of law on the issues submitted to the jury because, under Wyoming law, the employee handbook upon which Ms. Anderson relied at trial did not create an implied contract of employment, and, even if it did, Exxon did not breach that contract when it fired Ms. Anderson for drug use. In the alternative, Exxon argues that it is entitled to a new trial. We hold that the implied contract issue properly presented a jury question, but we agree with Exxon that Ms. Anderson's termination for a positive drug test did not breach any contract with her. Accordingly, we reverse the judgment.

## BACKGROUND

Appellant Exxon Coal, U.S.A. is a wholly-owned subsidiary of Exxon Corporation. During the period relevant to this case, Exxon owned two mines near Gillette, Wyoming, operating them through an unincorporated division known as the Carter Mining Company.[1] Tobey Anderson worked for Exxon from December 30, 1977 until her termination on July 2, 1993. She worked most recently in a warehouse at one of the mines as a "Materials Handler Grade 4," receiving promotions and largely positive evaluations of her work performance.

Exxon provided its employees, including Ms. Anderson, with the "The Carter Mining Employee Handbook," see R. Supp. Vol. I at tab 157-1, which was "intended to provide all employees, unless otherwise noted, with some information and guidelines on our general rules and policies for the purpose of encouraging a better work place." Appellant's App. Vol. I at 65. The handbook includes a table of contents, introduction, summary and index, and is divided into seventeen sections in bold-face type, some of which include subsections set off in bold-face, italicized type. The "Individual Recognition" section includes a subsection entitled, "The Carter Mining Company's Philosophy Regarding Unions," and refers to job security. Id. at 70-72. A section entitled, "Your Responsibilities" includes separate subsections for Carter Mining's

---

[1]The appellant identifies itself as Exxon Coal, U.S.A. doing business as the Carter Mining Company. For clarity, we refer to appellant as Exxon throughout, with references to Carter Mining only as that name appears in appellant's handbook.

discipline system and its drug policy. Under the "Positive Discipline" subsection, the handbook lists twenty-one rules of conduct, and explains that the "following list, although not all-inclusive, is illustrative of the kinds of violations which may result in disciplinary action or termination." Appellant's App. Vol. I at 86.

In the "Rules of Conduct" subsection, the handbook lists rules, the violation of which "may result in disciplinary action *or* termination," including: "Misuse of legitimate drugs or the use, possession, or sale of unprescribed controlled drugs on Company time or property; Possession, use, distribution, or sale of alcoholic beverages on Company property; [and] Reporting to work in an unfit condition." Id. at 86-87 (emphasis added).

The handbook also contains a separate subsection entitled "Policy Statement on Employee Alcohol and Drug Use," which provides in relevant part:

> The Carter Mining Company is committed to a safe, healthy, and productive work place for all employees. The Company recognizes that alcohol, drug, or other substance abuse by employees will impair their ability to perform properly and will have serious adverse effects on the safety, efficiency, and productivity of other employees and the Company as a whole. *The misuse of legitimate drugs or the use, possession, distribution, or sale of illicit or unprescribed controlled drugs on Company business or premises is strictly prohibited and is grounds for termination.* Possession, use, distribution, or sale of alcoholic beverages on Company premises is not allowed. Being unfit for work because of use of drugs or alcohol is strictly prohibited and is grounds for termination of employment. While this policy refers specifically to alcohol and drugs, it is intended to apply to all forms of substance abuse.
> The Company recognizes alcohol or drug dependency as a treatable condition. Employees who suspect they have an alcohol or drug dependency are encouraged to seek advice and to follow appropriate treatment before it results in job performance problems. . . .

No employee with alcohol or drug dependency will be terminated due to a request for help in overcoming that dependency or because of involvement in a rehabilitation effort. However, an employee who has had or is found to have a substance abuse problem will not be permitted to work in designated positions identified by Management as being critical to the safety and well-being of employees, the public or the Company. Any employee returning from rehabilitation will be required to participate in a Company-approved after-care program. If an employee violates provisions of the Employee Alcohol and Drug Use Policy, appropriate disciplinary action will be taken. Such action cannot be avoided by a request at that time for treatment or rehabilitation. If an employee suffering from alcohol or drug dependency refuses rehabilitation or fails to respond to treatment or fails to meet satisfactory standards of effective work performance, appropriate disciplinary action, up to and including termination, will be taken. This policy does not require and should not result in any special regulations, privileges, or exemptions from normal job performance requirements.

The Carter Mining Company may from time to time conduct unannounced searches for drugs and alcohol on owned or controlled property. *The Company may also require employees to submit to medical evaluation or alcohol and drug testing where cause exists to suspect alcohol or drug use.* Unannounced periodic or random testing will be conducted when an employee meets any one of the following conditions: has had a substance abuse problem or is working in a designated position identified by Management, a position where testing is required by law, or a specified executive position. *A positive test result or refusal to submit to a drug or alcohol test is grounds for disciplinary action, including dismissal.*

Id. at 90-92 (emphasis added).

In September 1989, following the Exxon Valdez disaster, Exxon adopted the foregoing drug and alcohol policy which was in effect at the time of Ms. Anderson's termination. Exxon distributed the policy to all employees, it held training seminars concerning the new policy for all employees, and it incorporated the new policy in the January 1990 update of the employee handbook. R. Vol. VIII at 190-192, 197-98.

Ms. Anderson testified that she read, understood, and relied on various portions of the employee handbook prior to her termination, including the handbook's alcohol and drug policy. R. Vol. III at 96-97, 101-117, Vol IV. at 18-20, Vol. V at 27-32.

In May or June 1993, Nick Kasperick, a maintenance manager for Exxon, received a phone call from Robert Harr, a contractor whose company, Basin Contracting, had previously worked for Exxon. Harr told Kasperick that he had information which led him to believe that "employees at Carter Mining company were involved in drug use." R. Vol. VIII at 178-79. After discussing this conversation with management, Kasperick set up a meeting between Harr and Exxon officials. Id. at 179. In early June 1993, Harr met for approximately one hour with Charlie Pate, employee relations manager, Kenneth Getz, accounting and administrative manager, and Wayne Jeffrey, safety department head. R. Vol. VII(1) at 69, Vol. IX at 21.

At the meeting, Harr informed Exxon officials that he had encountered drug and alcohol abuse problems with employees in his business, that he had "cleaned house," i.e., terminated some employees because of these drug and alcohol problems, and that he was concerned some Exxon employees may also have been involved with alcohol and drug abuse. R. Vol. VI at 180, Vol. VIII at 223, Vol. IX at 24-25. In this context, he specifically mentioned four Exxon employees, including Tobey Anderson. Harr said that

Ms. Anderson called his company, asking specifically for one of Harr's employees[2] to come to the Exxon mine site, and that he considered this request strange. R. Vol. VIII at 225, Vol. VII(2) at 18-19.[3] Harr stated that he did not specifically tell Exxon management that Ms. Anderson used, sold or distributed drugs, see R. Vol. VI at 152, and Getz testified that Harr did not specifically say that Ms. Anderson used drugs. R. Vol. VII(1) at 74. Getz, Pate and Jeffrey reported this information to Rodney Harrill, general manager of the Carter Mining Company. R. Vol. IX at 112.

Following the meeting with Harr, Exxon officials investigated his allegations. After checking records at Exxon and at Basin Contracting, Getz determined Ms. Anderson had been involved in the invoicing and approval or verification of Basin's work for Exxon. R. Vol. IX at 57; Vol. VII(2) at 12. Subsequently, Exxon requested Jerry Brooks, its investigator from Texas, to come to Gillette and interview Harr. R. Vol. VIII at 235. Brooks met with Harr for approximately two hours and reported to Pate and Getz

---

[2]Ms. Anderson allegedly requested that Dan Hodgin, the son of her boyfriend Rick Hodgin, come to the Exxon mine.

[3]Harr also allegedly told Exxon officials that Houston Aars, one of his former employees, said that he could get work at Exxon by giving its employees nose candy, i.e., cocaine, see R. Vol. VI at 156-157; Vol. VIII at 224, and that Ms. Anderson was one of Mr. Aars' contacts. R. Vol. VI at 189-191; R. Vol. IX at 25. However, Exxon officials gave conflicting testimony on this subject. Kenneth Getz testified that Harr said one of his employees was "delivering those drugs to the Bucket Wheel warehouse on to Miss Anderson." R. Vol. IX at 25. However, Charlie Pate testified that Harr's only reference to Ms. Anderson was that she called and requested that a specific employee come to the mine. R. Vol. VII(2) at 18-19. Given our strict standard of review, we rely only on the undisputed evidence set forth in the body of the opinion.

that Harr was a "credible witness." R. Vol. VII(2) at 169, 200. Based on Harr's information, Exxon officials decided to test for alcohol and drug use the four people Harr named. R. Vol. VII(2) at 75, 94; R. Vol. IX at 131-32. Two of the employees tested negative and retained their jobs, while the other two, including Tobey Anderson, tested positive and were terminated. R. Vol. IX at 109.

Ms. Anderson's test for alcohol and drugs occurred on June 21, 1993. In connection with the test, Ms. Anderson was required to list all medications she had taken in the last thirty days. Appellant's App. Vol. I at 95 (Drug Testing Form). After the test, she remembered other medications, and contacted Exxon to add them to those she had listed. R. Vol. III at 152.

On June 27, Dr. John Schaller, a physician and medical review officer for Exxon, informed Ms. Anderson that she had tested positive for cocaine.[4] Dr. Schaller asked Ms. Anderson to provide him with the labels or ingredients of medications she listed with which he was not familiar. He also ascertained that she had not been to the doctor's office, emergency room, or had any medical procedures recently. Ms. Anderson informed him that the only other medication she was using, but had not listed, was a mouthwash for

---

[4]At trial, Ms. Anderson conceded the validity of the positive test result. R. Vol. IV at 54-55; R. Vol. V at 16. However, counsel spent considerable time at trial and in the briefs explaining that Ms. Anderson contacted an attorney after her first alcohol and drug test, who advised her to obtain a second test. She had the second test approximately 25 hours after the first test, and tested negative for cocaine. Appellee's Supp. App. at 18; R. Vol. III at 147-51. The undisputed positive test controls the disposition of this appeal.

canker sores called "Mother's Mix." Dr. Schaller requested the friend's name who had provided the solution, which Ms. Anderson provided to Exxon officials. Subsequently, Dr. Schaller requested that she send in the "Mother's Mix" for testing, and discovered that it contained cocaine. R. Vol. IX at 179, 183-191; R. Vol. III at 155-58, 162-63, 166-68.

Ms. Anderson testified that she obtained her first container of "Mother's Mix" from a friend named Lonnie Dorward to treat her daughter's sore throat. Ms. Anderson knew that Ms. Dorward's brother had used the solution to treat AIDS-related skin lesions, but did not ask what the solution contained. R. Vol. IV at 84-86. Ms. Anderson subsequently asked Ms. Dorward to send a second container of "Mother's Mix" because she was experiencing painful mouth sores. Ms. Dorward told Ms. Anderson that she would try to get some more "Mother's Mix" from her brother's former companion, who lived in Las Vegas. Id. at 91-92. Ms. Dorward testified that the companion mailed a vial of the solution to her in New York, and she in turn, re-bottled and mailed it to Anderson. R. Vol. V at 225-27. The "Mother's Mix" solution had no label, Ms. Anderson did not obtain it from a doctor or with a prescription, and she did not consult a physician or dentist about using it, or about her complaint of mouth sores. R. Vol. III at 155, 167; Vol. IV at 84, 87.

After "reviewing everything," Dr. Schaller informed Ms. Anderson that her explanation for testing positive was not a legitimate medical explanation, and he reported

the positive result to Exxon management. R. Vol. IX at 191-92. Based on this positive drug test result, Exxon officials terminated Ms. Anderson's employment on July 2, 1993. Appellee's Supp. App. at 19. When Mr. Getz called Ms. Anderson to terminate her employment, Ms. Anderson sought to explain how she ingested cocaine and tested positive, and offered to take drug tests every morning before work in order to retain her job. However, Mr. Getz informed her that the termination was final, and she had no further hearing with Exxon officials. R. Vol. III at 168; Vol. VII(1) at 54. Ms. Anderson then brought this action.

## DISCUSSION

We review de novo the district court's determination of a renewed motion for judgment as a matter of law, applying the same legal standard as the district court. Haines v. Fisher, 82 F.3d 1503, 1510 (10th Cir. 1996). Under this standard, we may find error in the district court's denial of the motion only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion. Id. "We do not weigh the evidence, pass on the credibility of the witnesses, or substitute our conclusions for that of the jury. However, we must enter judgment as a matter of law in favor of the moving party if 'there is no legally sufficient evidentiary basis . . . with respect to a claim or defense . . . under the controlling law.'" Harolds Stores, Inc. v. Dillard Dep't Stores, Inc., 82 F.3d 1533, 1546-47 (10th Cir.) (citations omitted) (quoting

- 10 -

Fed. R. Civ. P. 50(a)), cert. denied, 117 S. Ct. 297 (1996). In this diversity case, the

substantive law of Wyoming controls the analysis of the underlying claims, while the

appropriateness of a Rule 50 judgment as a matter of law is a federal procedural issue.

See Sellers v. Allstate Ins. Co., 82 F.3d 350, 352 (10th Cir. 1996); Lyon Dev. Co. v.

Business Men's Assurance Co. of Am., 76 F.3d 1118, 1121-22 (10th Cir. 1996).[5]


A.     Contract

Ms. Anderson contends that Exxon's employee handbook created a contract with

her because "the . . . handbook listed specific causes for discipline and discharge,

provided a progressive discipline system, promised employees fairness, trust, job security

and the weighing of extenuating circumstances . . . ." Appellee's Br. at 23. She argues

that at the least, these handbook provisions made the contract issue a jury question, and

amply supports the jury's affirmative finding on the question.

Exxon responds that handbook language emphasizing trust, fairness, team efforts,

security, cooperation and the like are simply generalized statements of aspirational goals

and unambiguously do not amount to an objective manifestation of assent to contract

under Wyoming law. Defendant-Appellant's Br. at 18. Exxon further argues that the

---

[5]Ms. Anderson filed a motion to strike certain portions from Appellant's Appendix
because they were not offered or received as evidence at trial. We accept these portions
of the appendix for the limited purpose of reviewing all the information before the district
court when it denied Exxon's renewed motion for judgment as a matter of law. However,
we do not rely on these portions of the appendix in the disposition of this appeal.

progressive discipline provisions of the handbook do not create a contract because they expressly permit the company to bypass positive discipline if, "in the company's opinion, an employee commits an act of such magnitude . . . [that] immediate termination is warranted." Id. at 19 (internal quotations omitted). One such act, it contends, is drug use. Id. Finally, Exxon argues that the terms of the company's drug policy in the handbook did not create an implied contract under Wyoming law relating to the effect of drug, alcohol, and contraband policies promulgated by employers. Id. at 24-25.

"Employment contracts are presumed to be at will in Wyoming and, absent more, discharge may occur without cause." Garcia v. Uniwyo Fed. Credit Union, 920 P.2d 642, 645 (Wyo. 1996); see also Sanchez v. Life Care Ctrs. of Am., 855 P.2d 1256, 1257 (Wyo. 1993). An employee handbook may, however, alter the at-will presumption if its terms reasonably create an expectation on the part of an employee that the company will not discharge him or her without cause. See Loghry v. Unicover Corp., 927 P.2d 706, 710 (Wyo. 1996) ("an employment handbook may imply a contractual term requiring termination for cause"); Garcia, 920 P.2d at 645; Wilder v. Cody Country Chamber of Commerce, 868 P.2d 211, 216 (Wyo. 1994) (implied in fact contracts of employment arise from a mutual agreement and intent to promise which is found in the acts or conduct of the party sought to be bound, including statements in employee handbooks); McDonald v. Mobil Coal Producing, Inc., 820 P.2d 986, 990 (Wyo. 1991) (holding handbook provisions and employer's course of dealing relevant in determining existence of

- 12 -

contract).  "The benefits extended to the employee in the handbook are enforceable contract terms, because they are supported by consideration flowing to the employer. That consideration consists of the benefit of an orderly, cooperative and loyal work force."  Leithead v. American Colloid Co., 721 P.2d 1059, 1062-63 (Wyo. 1986);  see also Mobil Coal Producing, Inc. v. Parks, 704 P.2d 702, 707 (Wyo. 1985).

Certain handbook provisions are especially probative of the existence of an implied in fact contract:  those intended to include that which is usually found in a labor agreement, Parks, 704 P.2d at 706-07; and those that describe a discipline system and list infractions which may result in discipline or termination.  Id. at 705-06; see also Garcia, 920 P.2d at 646 (explaining that to make an implied in fact contract, handbook must clarify what constitutes cause, or include a progressive discipline schedule); Leithead, 721 P.2d at 1063 ("By listing misconduct that could result in discharge, the handbooks imply that cause is required.").

As indicated above, the handbook contained numerous elements similar to those described in the Wyoming cases, including those just listed.  Chief among those factors are the discipline provisions strongly indicating that employees could not be terminated except for cause.

In Wyoming, such provisions may create an expectation on the part of an employee that they will be followed, and they may induce an employee to continue his employment. Parks, 704 P.2d at 707.  More important, Wyoming law makes clear that determination of

- 13 -

whether an implied contract exists is usually a question for the trier of fact. <u>Continental</u> <u>Ins. v. Page Eng'g Co.</u>, 783 P.2d 641, 651 (Wyo. 1989).

Here, although we regard it as a close question, we hold there was enough in the Exxon handbook to permit the question of the existence of an implied contract to go to the jury. Likewise, we hold that the evidence is sufficient to uphold the jury's finding that the handbook created a contract between Exxon and Ms. Anderson requiring termination only in accordance with terms set out in the handbook.

In reaching these conclusions, we have considered, but are unpersuaded by Exxon's arguments with respect to the drug and alcohol policy alone. Exxon relies on <u>Horne v. J.W. Gibson Well Serv. Co.</u>, 894 F.2d 1194, 1195 (10th Cir. 1990), where, applying Wyoming law, we held that an employee handbook which included a drug-use policy did not contain provisions sufficient to alter employment at will. We noted, however, that the employee handbook in that case did not extensively list conduct which may lead to discharge, or establish a progressive discipline system, and that the presence of such factors can limit an employer's right to discharge an employee. <u>Id.</u> at 1195-96 n.3.

**B.      Breach**

The question then becomes whether any reasonable jury could find that Exxon breached its handbook contract with Ms. Anderson when it fired her because of a positive

drug test. Exxon says not. In support, it relies primarily on the following handbook provision which is part of the "Policy Statement on Employee Alcohol and Drug Use:"

> The Carter Mining Company may from time to time conduct unannounced searches for drugs and alcohol on owned or controlled property. *The Company may also require employees to submit to medical evaluation or alcohol and drug testing where cause exists to suspect alcohol or drug use.* Unannounced periodic or random testing will be conducted when an employee meets any one of the following conditions: has had a substance abuse problem or is working in a designated position identified by Management, a position where testing is required by law, or a specified executive position. *A positive test result or refusal to submit to a drug or alcohol test is grounds for disciplinary action, including dismissal.*

Appellant's App. Vol. I at 68-69 (emphasis added).

Ms. Anderson makes several arguments in response: (1) Exxon had no cause to suspect that she was using drugs; (2) the misconduct relied upon for termination had no connection to the workplace; (3) management did not adequately investigate any charge of drug use before requiring testing; (4) the company did not weigh extenuating circumstances; (5) the company was obligated to--and did not--apply the progressive discipline system; and (6) the company breached its obligation to treat employees fairly, provide job security and build trust. Appellee's Br. at 24.

Taking these arguments in order, we first address the "cause to suspect" prerequisite for a drug test. Ms. Anderson devotes a considerable portion of her brief to the proposition that Robert Harr was not a reliable informant and that he did not specifically accuse Ms. Anderson of drug use in any event. She also argues that Exxon's

investigation failed to establish "cause" to suspect drug use and was inadequate. Appellee's Br. at 13-18, 40.

The drug policy does not require any investigation. It only requires cause to suspect in order to require a drug test. Suspicion in this civil contract setting does not relate to Fourth Amendment standards. It must be accorded its common meaning in ordinary parlance which, according to the dictionary, includes doubt, mental uneasiness and uncertainty, or to imagine one to be culpable without proof or with a slight touch or trace of proof. Webster's Ninth New Collegiate Dictionary 1189 (1985). See Union Pac. Resources Co. v. Texaco, Inc., 882 P.2d 212, 220 (Wyo. 1994) (words in contract must be given their "plain meaning"). That definition establishes an extremely low threshold for "cause," understandably so where drug use is concerned.

The evidence here satisfies that standard within the requirements of our standard of review. Exxon received four names, including Ms. Anderson's, in the context of a report about drug use at its mine, had no reason to disbelieve the information, had no contractual duty to make a further investigation, and tested all four of the people mentioned. Cf. Garrison v. Department of Justice, 72 F.3d 1566, 1568 (Fed. Cir. 1995) (holding, under stricter Fourth Amendment standard, that employer had reasonable suspicion for drug test based on available information regardless of facts subsequently available or discoverable through further inquiry), cert. denied, 117 S. Ct. 358 (1996).

- 16 -

The balance of Ms. Anderson's arguments--a duty to weigh extenuating circumstances, apply progressive discipline, and treat her fairly--relate to her underlying position that the drug policy provisions of the handbook cannot be read in isolation from the progressive discipline and other sections.  The district court apparently agreed, holding that the jury should determine the effect of these handbook provisions.

We respectfully disagree with our distinguished colleague on the district bench, and with Ms. Anderson, on this issue.  The Wyoming Supreme Court has held that "general terms and provisions in a contract yield to specific ones, if not reconcilable." Landen v. Production Credit Ass'n of Midlands, 737 P.2d 1325, 1328 (Wyo. 1987). Here, any general promise of job security or promise of progressive discipline in various circumstances, is controlled by the specific language that a positive drug test is ground for disciplinary action or termination.[6]  The handbook could not be clearer on the point. There is nothing for a jury to decide without asking it to rewrite the handbook provision relative to the company's right to terminate an employee for a positive drug test.  And, given the prevailing mood in society about drugs, it would be surprising that anyone

_____

[6]See Appellant's App. Vol. I at 92.  This specific and unambiguous term also disposes of Ms. Anderson's argument that Exxon improperly based its decision to terminate her on information that had no direct connection to the workplace.  The district court agreed with Ms. Anderson on this point, at least to the extent of deciding in this, and one other case, that the drug policy was ambiguous as to whether it required some impact on job performance prior to termination.  Appellee's Br. at 38-39 (citing Godfrey v. Exxon Coal, U.S.A., No. 93-CV-0016-J (D. Wyo. Aug. 6, 1993)).  We disagree.  The sole prerequisite set out in the applicable paragraph of the handbook is a positive drug test.  There is nothing ambiguous about that provision.

- 17 -

would think that an employer would forfeit the right to fire an employee testing positive for drugs.

As we said in <u>Williams v. Maremont Corp.</u>, 875 F.2d 1476, 1486 (10th Cir. 1989), what the employer did here--fire a faithful, long-term employee with an essentially unblemished record, for a single seemingly small infraction--may have been unfair and harsh, but that is not the question. The question is whether the employer had the right to do what it did. We hold that the handbook gave Exxon the right to terminate Ms. Anderson.

## CONCLUSION

Accordingly, Exxon's post-trial motion for judgment as a matter of law should have been granted. The judgment of the district court is REVERSED.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge

No. 96-8032, <u>Anderson v. Exxon Coal U.S.A., Inc.</u>

BRISCOE, Circuit Judge, dissenting:

I respectfully dissent.  I agree with the majority that the question of whether the employee handbook created an implied contract was properly submitted to the jury and that there was sufficient evidence presented to the jury for it to find the handbook created a contract between Tobey Anderson and Exxon.  Where I part company with the majority is in its resolution of the issue of whether Exxon breached the contract.  The specific issue we must first address is not whether an Exxon employee can be terminated after testing positive for cocaine, but whether Exxon had cause to require this employee to submit to drug testing.

The handbook does not require employees to submit to drug testing whenever the company has a mere unfounded suspicion of drug use.  It requires employees to submit to testing only when there is *cause* to suspect drug use.  Cause is defined as "reason" or "good or adequate reason."  <u>Webster's Third New International Dictionary</u> 356 (1993).  The company's employee relations manager testified that cause to suspect alcohol or drug use means "reasonable cause."  R. Vol. VI at 99, Vol. VII(1) at 16.[1]  The threshold for

---

[1] Employee handbook cases provide little guidance on this issue.  Although not controlling here, interpretations of collective bargaining agreement provisions on drug testing are instructive.  Collective bargaining agreement provisions requiring reasonable suspicion or reasonable cause for drug testing are frequently interpreted as requiring grounds sufficient to satisfy the Fourth Amendment reasonable suspicion standard; the employer must be able to articulate a reasonable basis for believing a particular employee has been using drugs.  Tia Schneider Denenberg and R.V. Denenberg, <u>Alcohol and Other Drugs:  Issues in Arbitration</u>, 168 (1991); Robert DeCresce, et al., <u>Drug Testing in the Workplace</u>, 138 (1989).  <u>See also</u> David G. Evans, <u>Drug Testing Law, Technology and Practice</u>, § 3:32 (1996).  At a minimum, the employer must have good reason to believe the employee has been using drugs.  Unfounded suspicion is insufficient.  Frank Elkouri and Edna Asper Elkouri, <u>Resolving Drug Issues</u>, 296-98 (1993).  Uncorroborated reports
(continued...)

cause may be low, but not as low as the majority would make it. Here, there was a great deal of evidence that Exxon had no cause whatsoever to suspect Anderson was using or distributing drugs.

As the majority notes, of those present at the meeting between Robert Harr and Exxon management, only personnel director Kenneth Getz recalled Harr making any specific allegation that Anderson used or distributed drugs. Harr and Charles Pate both testified that Harr did not say Anderson used or distributed drugs. Rodney Harrill, who made the decision to test Anderson, acknowledged that he heard no information stating Anderson used or distributed drugs. R. Vol. VII(2) 55-56, 67. Conflicts in the evidence are for the jury to resolve. Consequently, we must presume the jury found that Harr did not allege Anderson used or distributed drugs.

Moreover, Exxon did not receive Anderson's name in the context of a report concerned solely with drug use and distribution at the mine. Harr alleged conflicts of interest and disloyalty as well as drug use by Exxon employees. There was evidence that Harr alleged drug use or distribution by some unnamed Exxon employees and identified only one Exxon employee, Lowell Sherrod, as a user. R. Vol. VI 166-67. Harr named three other employees, including Anderson, in his conversation with Exxon management, but there was evidence he alleged only disloyalty and conflicts of interest and did not allege they used or distributed drugs. There was evidence that his only allegation against Anderson was that she used her position with Exxon to give work to Dan Hodgin, her

---

[1](...continued)
from co-employees or others may not be sufficient to establish reasonable suspicion justifying a drug test. Denenberg at 175-76.

boyfriend's son.  R. Vol. VI 163-67, 181, 191, 204-05; Vol. VII(1) 69-74, 90-91; Vol. VIII 225.

Even Exxon investigator Jerry Brooks did not consider Anderson a drug suspect. Neither Harr nor the one other person Brooks interviewed told Brooks that Anderson used or distributed drugs.  Brooks' only concern about her was the possible conflict of interest. R. Vol. VII(2) 158, 170, 194, 198, 204-05.  Neither Brooks nor mine management learned anything that could support a suspicion that Anderson used or distributed drugs.  Harrill based his decision to test Anderson for drugs largely, if not entirely, on Harr's statement that Anderson had requested that her boyfriend's son be sent from Basin Contracting to do work for Exxon.  R. Vol. VII(1) 74-76.  This information concerning a potential conflict in interest would not provide cause to suspect Anderson of drug use.

There was also evidence Exxon had reason to question the accuracy of Harr's allegations.  Exxon was aware through Brooks, its investigator, that Harr had no personal knowledge of any of the drug allegations, R. Vol. VII(2) 122-24, 167, and that any information Harr had received from Houston Aars was at least six months out of date.  R. Vol. VII(2) 165-66.  Brooks also learned that Harr's allegation against Exxon employee Jim Smith was incorrect.  R. Vol. VII(2) 116-22, 146-47, 163.  There was also evidence Exxon had in its possession information showing that some of Harr's allegations could be incorrect.  Harr had alleged Exxon employee Kathy Heppner had been accepting favors in exchange for giving business to Basin, but Exxon records showed Heppner had not approved any of Basin's invoices.  Nor were there any discrepancies between invoices and tally sheets that would suggest any financial irregularities by Exxon employees.  R. Vol. VII(1) 50-52, 76-78, 86; Vol. VII(2) 12, 61, 63, 119-22, 146-47, 152, 163; Vol. VIII 234-

38; Vol. IX 57-58, 71.  Had management bothered to check Anderson's employment records or to ask her supervisors, they would have found no indication that she used or distributed drugs.  To the contrary, they would have discovered she was an excellent employee with an excellent employment record.

Viewed in the light most favorable to Anderson, who prevailed in the district court, the evidence supports a finding that Exxon required Anderson to submit to drug testing based on stale hearsay of questionable reliability *that did not even purport that she was involved in drugs*.  The jury therefore could reasonably have found that Exxon breached the contract by requiring Anderson to submit to drug testing without cause or reason to suspect her of using drugs.  Our standard of review compels the conclusion that the jury's determination should be upheld.