Therisa GARCIA–HARDING, Plaintiff,

v.

BANK MIDWEST, N.A., Defendant.

No. 96–2352–KHV.

United States District Court,
D. Kansas.

April 23, 1997.

**1494**

Ruth M. Benien, Benien & Kaplan, Chtd., Kansas City, KS, for Therisa M. Garcia–Harding.

John J. Yates, Daniel Y. Hall, Nicole T. Bock, Bryan Cave, L.L.P., Kansas City, MO, for Bank Midwest, N.A.

### Memorandum and Order

VRATIL, District Judge.

Plaintiff Therisa Garcia–Harding initiated this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"),[1] claiming that her former employer, defendant Bank Midwest, N.A. ("Bank Midwest"), harassed and discriminated against her on the basis of her national origin, Mexican–American. Plaintiff also claims that de-fendant retaliated against her for complaining of allegedly discriminatory acts of Bank Midwest employees and for filing a charge of employment discrimination with the Equal Employment Opportunity Commission ("EEOC"). Finally, plaintiff alleges that defendant breached an implied contract of employment and violated the public policy of the state of Kansas by terminating her employment. This matter comes before the Court on *Defendant's Motion for Summary Judgment* (Doc. # 29) filed February 19, 1997.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. A "genuine" factual dispute requires more than a mere scintilla of evidence. Id. at 252, 106 S.Ct. at 2512.

The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga Okla.,* 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *See Applied Genetics Int'l. Inc., v. First Affiliated Securities, Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The nonmov-

---

**1.** Plaintiff also raises claims under 42 U.S.C. § 1981, under the Kansas Act Against Discrimi-nation, K.S.A. § 44–1001 *et seq.* ("KAAD"), and under Kansas common law.

ing party may not rest on its pleadings but must set forth specific facts. *Applied Genetics,* 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." *Deepwater Investments, Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *See Anderson,* 477 U.S. at 250–51, 106 S.Ct. at 2511–12. "In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 793 (10th Cir. 1988). Where the nonmoving party fails to properly respond to the motion for summary judgment, the facts as set forth by the moving party are deemed admitted for purposes of the summary judgment motion. D. Kan. Rule 56.1. Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2512. Ever mindful of these summary judgment standards, we now turn to the merits of defendant's motion.

### Facts [2]

*Cast of Characters*

Plaintiff is a person of Mexican–American heritage. She worked as a teller and a teller supervisor at Home State Bank for ten years, from October 1984 until September 1994, when Bank Midwest acquired Home State Bank. Plaintiff then worked as a teller supervisor at the Bank Midwest branch at 5th and Minnesota until defendant terminated her employment on April 12, 1996.

Plaintiff is a high school graduate. From 1981 to 1984, she worked for 1st National Bank of Shawnee as a customer service representative and as a teller. In these positions, she opened new accounts and handled individual retirement accounts ("IRA"s), certificates of deposit ("CD"s) and repossessions. Prior to that she worked at Capital Federal Savings & Loan as a teller and at Montgomery Ward in its credit department. At Home State Bank, plaintiff served as a vault teller, distributing money to tellers and to business customers. She also served as supervisor of four to five tellers in the drive-in facility and later as lobby supervisor with responsibility for all tellers in the facility. For the four-year period from 1990 until the Bank Midwest acquisition in 1994, plaintiff held the title of Assistant Vice President at Home State. The only time plaintiff worked as a bank customer service representative was before she worked at Home State.

Steve Terbovich, a white male, began employment at Bank Midwest in September 1994 as Senior Vice President and Branch Manager of Bank Midwest's 5th and Minnesota branch. He was plaintiff's direct supervisor.

Margaret Bosley, a white female, has been Senior Vice President, Deposit Operations, for Bank Midwest since December 1992. In that capacity, she is responsible for operational policies and procedures of the bank. She directly supervises branch managers in the Kansas City metropolitan area. Bosley did not have direct responsibility for reviewing plaintiff's job performance because teller supervisors such as plaintiff reported directly to assistant branch managers and branch managers. Through the chain of command, however, teller supervisors ultimately reported to Bosley on bank rules, operational procedures and policies.

Plaintiff believed that Bosley was accessible to her if she had a question about policy or procedure in the bank, but she did not feel that she could go to Bosley to complain of discrimination. Nor did she feel that she could go to the bank's human resources department or the bank's attorneys. She did feel that she could trust Terbovich and discuss problems with him.

---

**2.** The facts set forth in this memorandum and order are either uncontroverted or, where controverted, construed in the light most favorable to plaintiff. Immaterial facts and factual allegations not properly supported by the record are omitted.

Donna Cooley, a white female, began working at Bank Midwest in March 1995. She was a Customer Service Supervisor and later an Assistant Branch Manager at the 5th and Minnesota branch. Before joining Bank Midwest, Cooley had worked for 17 years in various financial institutions in positions including teller, customer service, assistant branch manager, trainer and branch manager. She had also worked for the Resolution Trust Corporation.

Paul Slover, a white male, was Assistant Branch Manager at the Grandview, Missouri, branch of Bank Midwest until March 1996, when he and Cooley switched jobs and he became Assistant Branch Manager at the 5th and Minnesota branch.

Rick Smalley, a white male, is the Senior Executive Vice President and Chief Operating Officer of Bank Midwest. In that position, he was involved in making the final decisions both to promote Cooley and to terminate plaintiff.

Lisa Fisher, a white female, was Assistant Vice President and an assistant to Bosley in Deposit Operations at Bank Midwest. In that capacity, she was responsible for ensuring, among other things, that tellers were complying with bank procedures.

Patricia McKinney and Marquita Brockman, African–American females, became employees at the Bank Midwest 5th and Minnesota branch, like plaintiff, when Bank Midwest acquired Home State Bank, where they had been previously employed. Both were Customer Service Representatives whose primary responsibilities involved opening new accounts, responding to customer inquiries and complaints, and handling transactions which were not loans and not handled by tellers. McKinney was also an Assistant Vice President.

Jackie Kline, a white female, was a teller at Bank Midwest's 5th and Minnesota location. Plaintiff was Kline's direct supervisor.

Susie Zanatta, a Mexican–American female, was also a teller for Bank Midwest at the 5th and Minnesota location. For a period of time ending in 1995, Zanatta substituted for plaintiff as lead teller when plaintiff was absent because of her extended supervi-sory authority over teller operations at the Woodlands Race Track and at the 78th and State branch.

*Transition from Home State Bank to Bank Midwest*

Although no significant differences accompanied the 1994 change of ownership from Home State to Bank Midwest, plaintiff believed that Bank Midwest was "stricter" in enforcing rules and regulations than Home State had been. Plaintiff thought that was a change for the better. The actual policies and procedures, however, did not change significantly.

The main difference between Home State and Bank Midwest was the new computer system, ITI, which everyone had to learn. The ITI computer system is software which Bank Midwest uses to process transactions and to record and store customer information such as balances and interest rates. The system automatically calculates interest due and maturity dates, so long as the initial data is properly entered. Bank Midwest also uses software called Deposit Pro to produce all new account documentation. Assistant branch managers must know the software in order to review reports and determine if the reports are accurate. They also must be able to train employees on the system and know how to correct the system if an error occurs.

Bank Midwest gave Cooley two weeks of training to learn the new computer system. She was able to learn ITI and Deposit Pro and to perform and understand all essential functions of the systems. Plaintiff did not have comparable knowledge of ITI or Deposit Pro; her knowledge was limited to basic inquiry into the ITI system and teller machine operation.

*Plaintiff's January 1995 Review and Raise*

Terbovich had no criticisms of plaintiff's job performance as of January 1995. In January 1995, at Terbovich's recommendation, plaintiff received a $6,000 salary increase. Terbovich recommended the raise because plaintiff was responsible for the bank facility at the Woodlands Race Track (which she had been handling since 1989 or 1990) and for overseeing teller operations at the 78th and State

branch, in addition to her responsibilities at the 5th and Minnesota branch. In early 1995, Bank Midwest also restored the title of Assistant Vice President to plaintiff, When Terbovich and Cooley were absent, customer service representatives sometimes addressed questions to plaintiff because of her management position.

After plaintiff had received her raise in 1995, the State of Kansas withdrew state funds from Bank Midwest, and the Kansas Attorney General issued an opinion that state funds could no longer be deposited in any bank which was a branch of an out-of-state bank. This resulted in a substantial loss of business for the 5th and Minnesota branch. It significantly affected the nature of the branch's operations and significantly reduced plaintiffs responsibilities. The change also affected the responsibilities of other employees.

In 1995 Bank Midwest also hired a new teller supervisor at the 78th and State branch, which eliminated the need for plaintiffs involvement there.

*1995 Surprise Audit*

In August 1995, the Bank conducted a routing internal audit of teller procedures at the 5th and Minnesota branch. The audit found a number of situations where the branch teller organization had failed to comply with Bank Midwest procedures. Bosley felt that the results of the audit were unsatisfactory and reflected poorly on plaintiff as a teller supervisor. However, because Bosley did not supervise plaintiff directly, she never spoke with plaintiff about the audit, and she did not voice her opinion about the audit until the day defendant terminated plaintiff's employment.

The goal in conducting the audit was to get all the branches in line with each other. Terbovich had expected the audit to reveal deviations from procedure and areas that needed work. Some of the problems which the audit revealed had to do with Susie Zanatta, not with plaintiff, some of the prob-

lems identified by the audit were not within plaintiff's areas of responsibility at all.

Terbovich discussed the results of the audit with plaintiff. Having been a part of a team which had audited another branch, plaintiff researched the deviations from procedure which the audit had revealed and came up with a plan of action to correct them. Plaintiff then filed a formal response which detailed her findings.

Terbovich accepted plaintiff's response to the deficiencies identified by the 1995 audit and in fact basically adopted plaintiffs report as his own. He discussed plaintiff's suggested changes with Lisa Fisher, and she approved most of them on October 19, 1995.

*Donna Cooly's Hiring and Promotion*

In March 1995 Bank Midwest hired Donna Cooley, a white female, as a Customer Service Representative. The bank promoted Cooley to Customer Service Manager and then, on November 1, 1995, to Assistant Branch Manager and Assistant Vice President. Cooley's resume included 18 years of experience in financial institutions, mostly at savings and loans institutions and the Resolution Trust Corporation ("RTC"). She had also worked as a branch manager with responsibility for five employees.

Plaintiff believed, however, that Cooley should not have been promoted. According to plaintiff, Cooley was not comfortable making decisions and reviewing employees, and she failed to keep information confidential. For example, Cooley shared her review of Marquita Brockman with other bank employees and made fun of Brockman's requests for review. According to plaintiff, Cooley did not handle problems well and asked many questions concerning matters with which she should already have been familiar. Plaintiff also believed that she was more qualified for the position of Assistant Branch Manager because she was more comfortable with evaluations and had more knowledge about the branch. She believed that Cooley was not "management material" because she "went around telling employees things that should never have been told." [3]

---

**3.** Terbovich had told plaintiff that she was qualified for many of the duties of Assistant Branch Manager, that she had good bank knowledge and

that she was qualified to be a branch manager or assistant branch manager. Plaintiff was familiar with the job duties and responsibilities of both

Terbovich and Bosley recommended that Cooley be promoted to Assistant Branch Manager in November 1995, and Smalley gave final approval. Bank Midwest did not have a written job description for the position of Assistant Branch Manager. According to Bosley, however, the primary responsibilities of an Assistant Branch Manager are in the customer service area.

Before Cooley's promotion, Bosley had no discussions whether plaintiff was more qualified for the position than Cooley. In fact, defendant did not consider plaintiff or Patricia McKinney, the other minority employee who plaintiff believes was qualified, for the position. Both McKinney and plaintiff had been supervisors at the bank longer than Cooley. Bosley believed that plaintiff was not qualified because she did not know the Bank Midwest computer system, did not know how to open accounts, did not have Bank Midwest product knowledge or service knowledge, and had not been involved in overdraft decisions. Bosley also points to the lack of compliance with bank procedures revealed by the 1995 audit. Plaintiff states that Bosley had never complained to her about the 1995 audit, and that the audit revealed problems not only in her area of responsibility but also in customer service— Cooley's area of responsibility.

Terbovich believed that Cooley was the most qualified person to be Assistant Branch Manager because she had been an assistant branch manager, and she had training skills, FDIC insurance skills, good computer skills and knowledge of the ITI software which Bank Midwest used. Terbovich first told plaintiff that he did not know why Cooley had been promoted instead of her. He later told plaintiff that Cooley had been promoted because management was aware that Cooley wanted to leave Bank Midwest and that it

needed Cooley because she was experienced with IRAs. Bank Midwest did not have anyone else with IRA experience, and it needed a good IRA person.

The Assistant Branch Manager opening was not announced, and plaintiff did not know that the position was open until she learned of Cooley's promotion.

*Compliance Problems at Bank Midwest*

Bank Midwest requires customer service representatives to be cautious when opening accounts, especially accounts with small cash deposits or no cash deposits, because such accounts are frequently opened for fraudulent purposes. A customer service representative can refuse to open an account if he or she believes that the person attempting to open the account intends to defraud the bank or the merchant community. Bank Midwest represents to the public that it has no minimum balance requirement, however, and customer service representatives are not supposed to require a minimum deposit to open an account.[4] In addition, Bank Midwest does not require a waiting period before a customer can receive an ATM card; ATM cards are to be "instant" cards.

Contrary to these policies, Cooley instructed customer service representatives at 5th and Minnesota to require a $100 deposit from customers and wait 30 days before issuing ATM cards. Cooley claims that this instruction resulted from her mistaken belief regarding bank policy and that she reversed her instruction as soon as she discovered her mistake. Plaintiff alleges that in issuing the instruction Cooley intended to discriminate against certain bank customers. The walk-in population at 5th and Minnesota was mostly African–American, and plaintiff claims that customer service representatives applied Cooley's instruction inconsistently and based

---

positions. She specifically believed that she had the qualifications and experience necessary to be an assistant branch manager.

4. Pursuant to the Truth in Savings Act of 1991, contained in the Federal Deposit Insurance Corporation Improvement Act of 1991, 12 U.S.C. § 4301 *et seq.*, and Regulation DD promulgated thereunder, depository institutions must provide certain disclosures to consumers so that they may make meaningful comparisons among de-

pository institutions and informed decisions about accounts at those depository institutions. Among other things, depository institutions are required to disclose minimum balance requirements to open an account. Although the record is unclear on this point, the Court assumes for purposes of this *Memorandum and Order* that Bank Midwest's disclosures under Regulation DD provide that Bank Midwest does not require a minimum deposit to open an account.

on appearances, so as to have a disparate, deleterious effect on minority customers.

On November 21, 1995, the bank's Internal Compliance Committee held a meeting. At the meeting, plaintiff learned that bank policy was to require no minimum deposit to open an account. Fisher stated at the meeting that the branch at 78th and State was requiring a $100 deposit and that such requirement violated the bank's disclosures. Plaintiff stated that 5th and Minnesota was doing the same thing. Fisher and Mike Majors, who was in charge of compliance, instructed those in attendance at the meeting that such practices violated the bank's disclosures and must stop. Plaintiff claims that management did not follow up on this issue and that management's attitude at the meeting was unconcerned.

Plaintiff claims that when she complained to Cooley about the minimum deposit and the ATM waiting period, Cooley told her that it was her branch and she could do what she wanted. Cooley denies this, and claims that as soon as plaintiff informed her that the bank's disclosures prohibited an initial minimum deposit, she stopped requiring one and instructed other customer service representatives to do likewise.

Plaintiff later complained to Bosley and Terbovich[5] about the minimum deposit requirement and stated that it resulted in discrimination against some customers. In response, Bosley reviewed new account reports to determine whether they revealed a pattern of discrimination or failure to follow procedures. Bosley concluded that they did not. Bosley also spoke with Cooley and Bart Nill, the Branch Manager at 78th and State, both of whom denied the practices that plaintiff had alleged. Based on her investigation, Bosley concluded that there was no evidence of discriminatory treatment of customers opening new accounts. Terbovich spoke with Cooley, McKinney and Brockman in response to plaintiff's complaint. He also looked at new account openings and concluded that there was not a problem. Neither Bosley nor Terbovich told plaintiff that they were going to conduct or had conducted this investigation.

In plaintiff's opinion, the investigations by Bosley and Terbovich were inadequate because account records do not indicate the race of the person opening the account; they simply indicate that not all accounts were opened with a zero balance.

*Complaints of Racism at Bank Midwest*

1. "Black Spot" Incident

In July 1995, Brockman complained to Bosley and Terbovich that Janice Breshears, a fellow employee, "had something against" black employees and customers. Brockman relayed an incident in which Breshears had failed to comply with bank procedure of obtaining a driver's license picture when opening a new account. Because the new customer was black, Breshears had explained to Cooley that there was "no point" in taking a copy of the customer's picture, because "you just end up with a big black spot."

At the time, Brockman told Bosley that she had a good relationship with Cooley and Terbovich, but that she had difficulty dealing with McKinney, who she felt was not cordial to fellow employees.

Bosley followed up on Brockman's complaints with Cooley, Smalley and Terbovich. They resolved to counsel Breshears to be more sensitive, counsel Cooley to be aware of tensions in the workplace and try to minimize them, counsel McKinney about her attitude toward co-workers, allow Brockman to float among different branches, and counsel Brockman not to be so sensitive. In evaluating Brockman's complaints, Bosley and Terbovich concluded that she seemed to be "over sensitive" and "easily offended."

Cooley, Breshears' supervisor, did not discipline Breshears over the "black spot" incident. Plaintiff mentioned the incident to Terbovich and Bosley in January 1996 as an example of Cooley's poor management skills.

---

**5.** After Cooley rebuffed her, plaintiff did not immediately follow up with Bosley and Terbovich. Around January 29, 1996, according to plaintiff's deposition, she brought this problem to management's attention.

### 2. Dirty/White Incident

Plaintiff reports that in the bank lobby one day in late 1995, either Cooley or Breshears commented to plaintiff that her skin color was "white" but just "dirty." Plaintiff responded that she was Mexican. She does not remember the context in which the comment arose, and she did not report it to management, the human resources department or the EEOC.

At no other time did anyone at Bank Midwest make a derogatory comment to or about plaintiff based on national origin.

### 3. Customer Service Cooperation

In 1995 plaintiff perceived that Breshears and the other white women who worked in the customer service department were not assisting the two African–American Customer Service Representatives, McKinney and Brockman. Plaintiff did not ask why they were not assisting, but spoke with Cooley, who supervised the customer service representatives. Cooley explained that Breshears' job was to post new accounts. Because she did not supervise the customer service area, plaintiff did not know what duties the other white employees had.

In January or February 1996, plaintiff mentioned this perceived workload imbalance to Terbovich and suggested that he rotate customer service representatives to more evenly distribute their duties.

Brockman and McKinney had complained to Terbovich about their treatment at work. They complained that they were seated near the front of the lobby and therefore had to wait on more customers than the three white customer service representatives seated behind them. They complained that, because of this arrangement, they could not get their other work done and were subject to discipline for failure to complete assigned work on time. Plaintiff perceived that because of their complaints, Brockman and McKinney had been labeled as having a "bad attitude."

### 4. Criticism of Brockman

In his January 1996 review, Terbovich suggested that Brockman should adopt "a more professional 'business' dress."

### 5. Attempts to Get Rid of Employees

Plaintiff claims that Terbovich told her that he was trying to get rid of Brockman and McKinney and that he had a file on them. He allegedly offered to show the file to plaintiff, but she declined to look at it. Terbovich denies this.

*1996 Review*

On January 1, 1996, plaintiff received a formal written performance appraisal. The appraisal noted that plaintiff met or exceeded expectations in all areas. Plaintiff's appraisal commended her willingness to accept any necessary work assignments and stated that she had a "complete grasp of the skills and knowledge required in the teller area." The evaluation included an area for cooperation and attitude, and no negative references were noted with respect to plaintiff's refusal to follow bank procedures or to work with others. The review did not mention concerns about the internal audit in 1995 or plaintiff's ability to handle her job. However, as "Areas of Improvement," the appraisal suggested that plaintiff become totally knowledgeable of Bank Midwest policies, procedures and products and that she provide effective direct supervision to tellers in the lobby and drive-in. The appraisal commended plaintiff's customer service skills and "teller knowledge." Plaintiff did not say anything negative toward Terbovich or the bank in her January 1996 review.

*1996 Raises*

On January 1, 1996, Cooley received a pay increase from $1,166.57 per pay period to $1,375.00. Terbovich recommended that plaintiff not receive a pay increase in 1996 because she no longer supervised the tellers at 78th and State or the Woodlands racetrack. Also, plaintiff's responsibilities at 5th and Minnesota had been reduced. Bosley concurred with Terbovich's recommendation. Defendant informed plaintiff of these reasons why she was not receiving a raise, and plaintiff was thankful that her salary had not been cut, because she understood that no one was getting a raise. Plaintiff later learned that other employees had, in fact, received raises.

Plaintiff had been an Assistant Vice President and a member of the compliance committee since January 1995. She knew that she would have fewer responsibilities in 1996 than she had in 1995. The reduction in responsibility at 5th and Minnesota affected areas other than plaintiff's, however, and she believed that if other employees were receiving raises, she should also receive one.

Zanatta, also a Mexican–American, did not receive a pay increase even though she had a good review. All of the other tellers whom plaintiff supervised received a raise in 1996.

*January 1996 Meeting with Terbovich*

In January 1996 plaintiff asked Terbovich why she and Zanatta had been denied pay increases. Terbovich told her that it was because she no longer had to oversee 78th and State and because business had slowed down. When plaintiff asked if Terbovich had received a pay increase, he refused to answer. Terbovich claimed that Zanatta had "topped out" and was "making the maximum for a teller that Bank Midwest would pay." Plaintiff complained to Terbovich that two tellers at 78th and State were making more than Zanatta. Terbovich did not tell plaintiff that she was right or wrong, and no evidence in the record supports plaintiff's ·assertion. Terbovich's reason for not giving Zanatta the raise at that time was that Zanatta had gone from teller supervisor to teller.

*Complaints About Cooley*

On January 29, 1996, plaintiff complained to Terbovich about Cooley's promotion. According to plaintiff, Terbovich told her at that time that she had the experience and knowledge to be Branch Manager. According to Terbovich, he told her that Cooley's skills were substantially greater than hers. According to Terbovich, plaintiff did not suggest that Cooley's promotion was discriminatory. Plaintiff claims that she told Terbovich that Cooley's promotion was discrimination, however, and that Terbovich understood that that was her position. Plaintiff claims that Terbovich promised to get back to her but never did.

On January 29, 1996, plaintiff complained to Terbovich about Cooley's attitude, conduct as a bank officer, management abilities and attitude toward minority employees. Plaintiff complained that Cooley had acted in a discriminatory fashion toward customers and employees, and plaintiff also discussed with Terbovich different treatment of business customers. Plaintiff specifically complained that sometime in 1995, Terbovich had asked her to keep track of time working with minority business customers who had unique needs for services so that he could possibly start charging them for those services. Plaintiff and Terbovich discussed the business needs of minority and non-minority owned businesses at that time. Plaintiff apparently did not keep track of her time, however, and the bank never decided to charge for special services required by such minority customers.

*EEOC Contact and Notice*

Plaintiff has no reason to believe that Terbovich, Bosley or Smalley harbored ill will or bad feeling toward her because of her Mexican–American heritage. On February 12, 1996, however, plaintiff filled out an EEOC intake questionnaire with the fact that she had not received a pay increase or a promotion. In February 1996, within a week or so of her complaints to Terbovich about these matters, plaintiff told Terbovich that she had gone to the EEOC. Terbovich advised Bosley of this fact, and Bosley told Terbovich to tell Smalley about it. Slover later called Blanca Jensen to check on plaintiff's performance. He specifically asked about plaintiff's error ratio on currency transaction reports. Plaintiff believes that Slover was "checking around" on her, in an attempt to gather information supporting her termination.

Plaintiff did not file her EEOC charge of employment discrimination until April 24, 1996, after her defendant terminated her employment. The charge claimed that defendant had discriminated against plaintiff in failing to promote her, failing to give her a salary increase and terminating her employment.

*February 1996 Meeting with Terbovich*

Again in February 1996, plaintiff complained to Terbovich about Cooley and the fact that she had not received a raise. During this meeting, plaintiff told Terbovich that

"things were a mess" that customers and employees in Cooley's department were being treated discriminatorily, and that Cooley had told her things that only management above her should know.

Terbovich made no record of this meeting, and nothing in Cooley's personnel file indicates that she was disciplined on account of plaintiff's complaint.

*Zanatta Transfer*

In February 1996, after plaintiff had complained about discrimination, management transferred Zanatta to another branch without plaintiffs knowledge or input. Zanatta did not request the transfer, but she agreed to it. Defendant did not replace Zanatta at 5th and Minnesota, and the transfer left plaintiff shorthanded. Plaintiff complained to Bosley that she had not been notified of the transfer and about the impact it would have on her branch.

*Cooley's Complaints*

In February 1996, Cooley told Terbovich that she had concerns about the way she had been treated since her promotion. She believed that plaintiff was not talking to her and had told other tellers not to talk to her. In March 1996, Cooley told Bosley that she intended to leave the bank and that part of the reason was the way plaintiff had treated her as Assistant Branch Manager. Cooley told Bosley that plaintiff was uncooperative, that she would not speak with Cooley, that she had encouraged other employees not to speak with Cooley, and that these actions led to a division in the branch and affected employee morale. Cooley told Terbovich that she did not like the atmosphere at 5th and Minnesota, that she had been offered another job, and that she was planning to resign.

Ron Schieber, a supervisor in the loan department at 5th and Minnesota also told Bosley that he had observed a lack of cooperation between the customer service department and the tellers. Schieber, however, did not attribute this to plaintiff or to anyone else.

Plaintiff claims that her relationship with Cooley did not deteriorate after the pro-

motion, that she did not have problems working with Cooley, that Cooley was not rude to plaintiff and that plaintiff was not rude to her. In other words, plaintiff denies that she had anything to do with the hostile atmosphere which Cooley reported to Terbovich.

Terbovich did not verify Cooley's story with plaintiff. Terbovich thought that he knew plaintiff's version of the events, because of their meetings in January and February.

After receiving Cooley's threat of resignation, Bosley spoke with Smalley. Smalley agreed that Cooley was a valuable employee and that they did not want to lose her, so they decided to offer her the Assistant Branch Manager position in Grandview, Missouri, and to transfer Paul Slover from Grandview to 5th and Minnesota in her place.

At the time, Bosley did not speak with plaintiff about Cooley's complaints. Bosley does not know if anyone talked with plaintiff prior to deciding to transfer Cooley to Grandview. Bosley never asked employees at 5th and Minnesota whether Cooley's claims were true. She decided to transfer Cooley based on information provided by Cooley, Terbovich and Schieber.

*Verbal Warning*

Bosley and Smalley agreed that Bosley would meet with plaintiff to give her a verbal warning about her alleged conduct toward Cooley, advise her of the change in Assistant Branch Managers, let plaintiff know that her behavior was not acceptable, and tell her specifically what behavior was expected in the bank. On March 18, 1996, after Cooley's departure, plaintiff received a verbal warning from Bosley [6] that "behavior such as she had displayed with her treatment of [Cooley] was not going to be tolerated." Bosley also told plaintiff that Slover would be filling Cooley's position, that he was her superior, and that she was to cooperate with him and support his managerial decisions.

Plaintiff claims that she was cooperative and agreeable, and not insubordinate, in this meeting. She told management that customer service representatives were discriminating against customers by requiring them to

**6.** Terbovich also attended the meeting with plaintiff on March 18, 1996.

have different amounts of money to open accounts. She advised them that Cooley was not "management material" and that she did not treat confidential information appropriately. Defendant does not suggest that plaintiff was not entitled to make such comments. Management told plaintiff, however, that they were going to "start anew." Plaintiff indicated that she would try to cooperate. She agreed to work with Slover and stated that she felt she could do what they were asking. Bosley claims that before agreeing to cooperate and act appropriately, plaintiff became confrontational, raised her voice and "got in [Bosley's] face."

Bosley later prepared a file memorandum which summarized the counseling meeting with plaintiff as follows:

> .... As an officer of Bank Midwest, Therisa is to feel free to express her opinion in a private conversation with her supervisor, and with that complete, to set her personal feelings aside.
>
> Therisa was advised that on Monday, March 18, a new supervisor would be introduced to the branch staff. Paul Slover has been transferred from Grandview to be responsible for all branch non-lending functions and supervision. Theresa [sic] was told that she is expected to cooperate with her new supervisor, to treat him with the respect he deserves, to behave professionally, and as an officer of Bank Midwest to be supportive of Paul and his actions with the rest of the branch staff Therisa is to work with other members of management in a team effort and to relay instructions, policies, and any other communication from her supervisor or other members of management in a positive, supportive manner.
>
> Therisa was advised that behaviors as exhibited since Donna's promotion will not be tolerated and won't be permitted to continue.

*Internal Audit Review*

Bank Midwest conducted another audit of operating procedures in early 1996. The audit identified a problem with the fact that Jackie Kline, a teller who worked both inside the bank and in the drive-through facility, maintained one cash drawer for each location. Kline exceeded cash limits on all five days tested during the audit, and her two cash drawers had only one general ledger account. The auditor believed that a teller should not maintain two cash drawers and that discrepancies were likely to occur under those conditions. Plaintiff disagreed with the auditor, and felt that it was dangerous for the teller to carry a single cash drawer from one location to another. Plaintiff claims that she discussed the safety issue with the auditor and that he agreed with her. The Final Audit Report nonetheless noted the accounting problems with the two separate drawers and recommended that plaintiff, Terbovich and Bosley establish a procedure for the daily transfer of one cash drawer from the lobby to the drive-through facility.

*Counseling of Jackie Kline*

Despite plaintiffs understanding that the auditor had agreed with her safety explanation with respect to Kline's two cash drawers, the bank limited Kline to one cash drawer, which had to be carried from the main bank building to the drive-in teller facility. Fisher instructed Kline that a security guard would transport her cash drawer. Kline objected to this procedure, however, and, because they were concerned with her refusal to follow instructions from a supervisor, Slover and Fisher held an employee counseling session with Kline on April 11, 1996. As Kline's supervisor, plaintiff attended this session.

Defendant prepared a counseling statement form which summarized the counseling session with Kline. Kline signed the form to note her full disagreement with the issue, but the form stated that Kline was to discontinue working overtime and working the drive-through and that these changes would remove her "completely from the situation she disagreed with."

During the meeting, Kline was crying. Plaintiff tried to help by explaining that Kline's only objection was to carrying the cash drawer.[7] Plaintiff felt that Slover and

---

7. It is unclear from the record what the disagreement was all about, since a security guard was to carry the cash drawer.

Fisher were talking down to her, and she thought that "it was a bit extreme" to counsel Kline. Slover told plaintiff to show Fisher some respect, and plaintiff replied that she "would show Lisa Fisher some respect when I received some respect." Slover indicated to plaintiff that she was out of line, that she should respect Fisher as an officer and manager of the bank and that, as a professional, he expected plaintiff to act business-like. Plaintiff believed that the disciplinary interview of Kline was inappropriate and said so in front of Kline.

Bosley was not present at the counseling session, and she never spoke with Kline or plaintiff about what had occurred there. According to Bosley, however, Slover and Fisher reported that plaintiff "blew up during the later moments of the counseling session" and said "the whole thing is stupid."

Kline testified that plaintiff was not insubordinate in the counseling session, that plaintiff did not do anything that led her to think less of management, and that plaintiff did not raise her voice to Slover or Fisher. Plaintiff also claims that she was not insubordinate.

Slover and Fisher prepared a file memorandum on April 11, 1996, after the counseling session with Kline. They also telephoned Bosley to inform her what had occurred in that session. The counseling memorandum provided, in pertinent part:

> During Lisa's follow-up to my comments, Therisa was visibly irritated and at times seemed to questioned Lisa as if Lisa was the one being counseled. Lisa, on several occasions, reminded Therisa that she (meaning herself) was not the one being counseled and at one point after Therisa had become visibly disgusted with the situation stated to her, "Excuse me, don't raise your voice to me Therisa"...

> At this point, I looked at Therisa and told her I was extremely disappointed in the way that she had conducted herself in the meeting. I told her that she appeared to be siding against management and that I believed that even if she had not agreed with management's decision, that as part of management, I would have expected her

to have had at least one heel on management's side.

Bosley shared with Smalley the report from Fisher and Slover and recommended that plaintiff be terminated for insubordination. Bosley also asked Terbovich whether he objected to plaintiff's termination. He did not. At the time they decided to terminate plaintiff's employment, neither Bosley nor Smalley had personally spoken to plaintiff. In fact, Terbovich and Bosley did not talk with plaintiff about job issues or concerns from the time of the meeting in March 1996 meeting until the time defendant terminated her employment.

*Plaintiff's Termination*

On April 12, 1996, Bosley and Slover met with plaintiff and told her that she was terminated for insubordination. Plaintiff received a memorandum setting forth the reasons for termination. Plaintiff also received a severance offer, to which she did not respond. Plaintiff was not belligerent or rude in the meeting.

Although insubordination had also been the charge against Kline, defendant did not terminate her—or even put her on probation. Plaintiff was the only employee who defendant fired while Terbovich was Branch Manager at 5th and Minnesota branch. Plaintiff had received no discipline prior to termination—other than the verbal warning on March 18, 1996.

Bosley does not recall that any other employees in 1995 and 1996 advised management that they had contacted the EEOC or filed an EEOC charge before being terminated.

After plaintiff was terminated, defendant added several notes to her file which documented incidents, attributed to plaintiff, of failure to follow procedures.

Defendant claims that no one replaced plaintiff as teller supervisor and that Slover assumed most of those duties for several months. Defendant also claims that because of declining business at the bank, defendant downgraded plaintiff's position to head teller and filled it with Wendy Williams, an African–American. Plaintiff claims that Andrea

Stewart, a white teller, took over her job duties.

*Personnel Policies at Bank Midwest*

Bank Midwest's Employee Handbook aims for "consistent and equitable treatment for all employees." It states that relations between employees and the employer are always to be handled according to what is best for the organization and its employees, and in conformity with applicable federal, state, county and municipal regulations.

The Bank Midwest Personnel Policy Manual [8] advised supervisors, including plaintiff, that the purpose of its disciplinary policy was to provide for progressive, evenhanded, disciplinary action. Application of discipline under approved guidelines was to be consistent and equitable.

The Personnel Policy Manual required that all "verbal and written warnings must be documented in the employee's file." The Manual stated that this was important in order to avoid a situation where an employee was discharged with no written support for the decision. The Manual stated that in most cases, it was advisable to give an employee at least one documented verbal warning and one written warning before termination.

The Manual stated that warning notices should contain a time frame under which the employee must cease the unauthorized activity or improve performance and that the notice should be specific as to what improvement was needed. If an earlier warning had been given, the Manual noted that the current notice should denote the time period which had elapsed. The Manual continued that the employee should be asked to sign all warning notices to document that he or she received and reviewed each notice, that a notation should be made in the employee's file if consultations were made with the employee after a notice was given, and that meetings with an employee should be positive and intended to help the employee improve.

In cases where circumstances warranted immediate termination, the Personnel Policy Manual advised supervisors to document the situation thoroughly and to hold all meetings with at least one other corporate employee present with the employee.

The Manual advised supervisors that in terminating employment, they were responsible for following these outlined procedures. The Manual urged supervisors that it was imperative to maintain accurate records describing reasons for involuntary termination and indicated that such records would provide support for equal employment compliance and unemployment compensation.

Bank policy was to conduct performance reviews with all employees at least annually. The review was intended to assist and motivate employees to attain their maximum potential. It also was to provide management with an objective means of determining qualifications for merit salary adjustments while also tracking an employee's progress on the job. The performance review was to be in writing. The review date was to coincide with either the employee's anniversary date or the date of the proposed salary adjustments. Each review was to be discussed with the employee by the supervisor. The supervisor was to discuss both the areas of successful performance and items which needed improvement. The employee was to be allowed to place comments on the performance review form.

Bank Midwest's Employee Handbook told employees that it contained the "employment policies and procedures which have been adopted by your employer." The Handbook stated that one of Bank Midwest's goals was to "promote a work environment which is productive and stimulates the talents of each employee to their maximum level." The Handbook advised employees that it was formulated to provide a written reference source for all employees and that it was "intended to allow for consistent and equitable treatment for all employees." All employees were asked to sign a statement that they received the Handbook.

---

**8.** Bank Midwest distributes the Employee Handbook to all employees; the Personnel Policy Manual is given only to supervisors.

The Handbook advised that Bank Midwest's discipline program was to provide for "progressive, evenhanded, consistent, and equitable treatment for all employees." In addition, the Handbook stated that supervisors would use their experience and common sense in handling employees. The Handbook also stated that "[a]ny verbal or written warnings you receive shall be thoroughly documented and made a part of your personnel file." Each notice was to contain a time frame within which the employee was expected to cease the unauthorized activity or improve job performance. The Handbook told employees that they would be asked to sign each warning notice to document that they received and reviewed the notice.

Grounds for immediate termination listed in the Handbook included "[m]ajor violations of corporate policy, dishonesty, breach of confidentiality, insubordination, bankruptcy, conflicts of interest, and customer discourtesy."

With respect to promotion, Bank Midwest's Employee Handbook stated that the employer expects that the most qualified individual who has applied for a position will be placed in the position. It also stated that its decisions with respect to recruitment, training, promotion, demotion or termination shall be based on an individual's ability to perform essential job functions and that no employment decision shall be based on an individual's race, religion, sex, national origin, age, disability or veteran status.

Both the Employee Handbook and the Personnel Policy Manual included disclaimers, stating that such documents were not contracts and should not be interpreted by their readers as such. Both documents also stated that the relationship between the employer and the employee is and has always been an "at will" relationship.

When Bank Midwest took over Home State Bank in 1994, it distributed the Employee Handbook to employees. As a supervisor and member of management, Bosley testified that she was to use and follow the handbook with reference on how to treat employees.

*Personnel at Bank Midwest*

As of 1996, Bank Midwest had 541 employees of which five were black males, one was an Asian male, and eighteen were black females. The bank had no Hispanic male employees and only two Hispanic female employees. At the Kansas branches, of 114 employees as of September 25, 1996, the bank had one black male employee, six black female employees and one Hispanic female employee.

Of 56 employees at 5th and Minnesota when Bank Midwest acquired the facility in September 1994, the bank had six black employees and two Hispanic employees. In March 1996 the personnel at that branch was reduced to 20 employees. At the end of 1996, both Hispanic employees were gone.

*Plaintiff's Condition*

Plaintiff claims that as a result of stress at work, she suffered anxiety attacks, loss of appetite, and insomnia. Plaintiff's medical records reveal a history of depression, anxiety attacks, and stress at work dating back to at least 1989.

**Analysis**

*Discrimination*

In discrimination suits based on national origin, the elements of a plaintiff's case and the allocation of burdens are the same under Title VII, § 1981, and the KAAD.[9] *See Ran-*

---

9. The following analysis applies to plaintiff's claims that defendant discriminated against her based on her national origin by failing to promote her, failing to give her a raise and terminating her employment.

Although plaintiff claimed in the *Pretrial Order* (Doc. # 28) filed February 12, 1997, that defendant "harassed ... her in the terms and conditions of her employment ... on the basis of her national origin, Hispanic," plaintiff abandons any such claim in *Plaintiff's Memorandum in Support of Plaintiff's Response to Defendant's*

*Summary Judgment [sic]: Arguments & Authorities* (Doc. # 44) filed March 24, 1997. In her response, plaintiff states that she is not maintaining a separate claim for harassment and that she presents the "just dirty" incident merely as evidence of defendant's discriminatory intent with respect to the promotion, raise and termination issues.

The Court therefore need not address the hostile environment claim which plaintiff advanced earlier in this litigation.

*dle v. City of Aurora,* 69 F.3d 441, 450 (10th Cir.1995); *Davis v. Wesley Retirement Communities, Inc.,* 913 F.Supp. 1437, 1444 (D.Kan.1995); *Woods v. Midwest Conveyor Co., Inc.,* 231 Kan. 763, 766–68, 648 P.2d 234 (1982). In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court set forth a burden-shifting model for analyzing the evidence in a Title VII or § 1981 case. First, plaintiff must prove a prima facie case, that is, she must show: (1) that plaintiff belongs to a protected class; (2) that plaintiff suffered an adverse employment action; and (3) that similarly situated non-protected employees were treated differently. *See, e.g., Elmore v. Capstan, Inc.,* 58 F.3d 525, 529–30 (10th Cir.1995); *EEOC v. Flasher Co.,* 986 F.2d 1312, 1316 (10th Cir.1992). Once plaintiff has established a prima facie case, defendant must articulate some legitimate, nondiscriminatory reason for its adverse employment action. *Randle,* 69 F.3d at 451. If defendant is able to meet this requirement, the burden shifts back to the employee to prove that the proffered explanation of the employer is merely a pretext for discrimination—*i.e.,* that it is "unworthy of belief." *Id.* A plaintiff may get " 'over the hurdle of summary judgment" by demonstrating " 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action' " such that a reasonable factfinder could find the reasons unworthy of credence and infer that the employer did not act for those asserted legitimate, nondiscriminatory reasons. *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323–24 (10th Cir. 1997) (quotations omitted). Mere conjecture that the employer's explanation is a pretext for intentional discrimination, however, is not enough to overcome a motion for summary judgment. *Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10th Cir.1988).

For purposes of its motion, defendant has assumed that plaintiff can establish a prima facie case of discrimination on each of plaintiff's claims. The Court therefore assumes the same and begins its inquiry at the second step of the *McDonnell Douglas* analysis.

**1. Failure to Promote**

■ Plaintiff claims that she was more qualified than Cooley for the position of Assistant Branch Manager and that defendant promoted Cooley because plaintiff was Mexican–American. Defendant concedes that plaintiff has stated a prima facie case of discrimination but argues that it had a legitimate, nondiscriminatory reason for promoting Cooley, *i.e.,* that Cooley was more qualified.

Plaintiff contends that defendant's stated reason is pretextual. If plaintiff produces both a prima facie case of discrimination and evidence supporting a finding that defendant's alleged nondiscriminatory reason is pretextual, the case is ordinarily inappropriate for summary disposition. *Jones v. Unisys Corp.,* 54 F.3d 624, 630 (10th Cir.1995); *Durham v. Xerox Corp.,* 18 F.3d 836, 839–40 (10th Cir.), *cert. denied,* 513 U.S. 819, 115 S.Ct. 80, 130 L.Ed.2d 33 (1994).

Plaintiff believes that she was more qualified because she had greater seniority, because she did not believe that Cooley had the experience she claimed on her resume, and because Cooley was responsible for discriminating against minority employees and violating bank disclosures in a way that discriminated against minority customers.

The uncontroverted facts establish that defendant had a legitimate, nondiscriminatory reason for promoting Cooley over plaintiff— namely, that Cooley was more qualified for the position of Assistant Branch Manager. First, plaintiff admits that Assistant Branch Manager duties include primarily customer service. Cooley had been Customer Service Supervisor before her promotion and had prior customer service experience as well; plaintiff had worked in customer service in a prior job from 1981 to 1984 (eleven years earlier) and sometimes answered questions from customer service representatives at Bank Midwest in the absence of Cooley or Terbovich. Second, plaintiff admits that Cooley had experience with the ITI computer system, which was involved in customer service and in the Assistant Branch Manager job, whereas plaintiff had limited knowledge of it. Plaintiff does not dispute Bosley's assertion that comprehensive knowledge of

the computer system was a crucial job requirement for Assistant Branch Manager. Third, plaintiff states that Cooley did not have the qualifications set forth on her resume and that Terbovich did not verify them; however, plaintiff has presented no evidence which calls any of Cooley's qualifications into doubt. Plaintiff's subjective belief that Cooley's resume is defective does not create a triable issue of fact. Fourth, even if Cooley discriminated against minority customers and employees, plaintiff has not presented competent evidence that management knew of Cooley's conduct before it promoted her.[10] Finally, plaintiff's allegation that the 1995 audit revealed problems in Cooley's area (customer service) as well as plaintiff's area (teller services) does not demonstrate that plaintiff was more qualified than Cooley or create a triable issue of fact regarding defendant's intent in promoting Cooley. Plaintiff has not identified what problems the audit revealed with respect to customer service, or given the Court any guidance on how they might compare with the teller problems. Moreover, even though plaintiff complains loudly that Bosley did not express her opinion on the 1995 audit for several months, until defendant terminated plaintiff's employment, defendant has stated a legitimate, non-discriminatory reason for promoting Cooley instead of plaintiff. Cooley's background experience and qualifications.

Plaintiff's subjective belief that the bank's reason is pretextual is insufficient to satisfy her burden of proof and overcome defendant's motion for summary judgment. *Higgins v. Johnson Cty. Med. Laboratories, Inc.,* 1996 WL 707102, *34 (D.Kan.1996). Plaintiff has presented nothing but her subjective belief; consequently, her claim that defendant's decision to promote Cooley constituted national origin discrimination cannot survive summary judgment.

### 2. Salary Raise

Plaintiff claims that defendant discriminated against her on the basis of national origin when it denied her the pay raise afforded other employees in January 1996.

Evidence of differential treatment alone does not establish discrimination. *EEOC v. Flasher Co.,* 986 F.2d 1312, 1321 (10th Cir. 1992) ("Merely finding that people have been treated differently stops short of the crucial question: why people have been treated differently.").

It is uncontroverted that plaintiff's job responsibilities had diminished by 1996, the year after defendant had raised her salary to compensate for increased responsibilities. Plaintiff makes the conclusory assertion that other employees (including Terbovich) received raises in spite of reduced responsibilities. Her assertion is inadequate to show pretext because she does not specify what responsibilities were reduced or cite evidence that any similarly situated employees actually did receive raises. Similarly, plaintiff's conclusory assertion that white employees received raises while minority employees with more experience and better reviews did not does not adequately rebut Terbovich's explanation that plaintiff did not receive a raise because of her diminished responsibilities and Zanatta did not receive a raise because she had "topped out."

Plaintiff has submitted no evidence in support of her claim that would tend to establish that similarly situated employees were treated differently on the basis of their national origin. In fact, plaintiffs own evidence establishes that Zanatta was earning more than any other teller—a fact which supports Terbovich's explanation. Plaintiff's evidence also shows that some white employees did not receive raises and some minority employees did. In short, plaintiff has not submitted any evidence that supports her allegations and in fact has submitted evidence which undermines them.

Plaintiff has not submitted sufficient evidence to show that defendant's proffered reasons for denying plaintiff a raise include any "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" such that a reasonable factfinder could rationally find them unworthy of credence and infer that the employer acted with discriminatory intent. The Court may not second-guess Bank Mid-

---

**10.** Indeed, plaintiff has not presented competent evidence that Cooley's alleged discriminatory conduct occurred before defendant promoted her.

west's managerial decisions on such a scant record. Defendant has come forth with a legitimate, nondiscriminatory reason for failing to award plaintiff a raise in 1996, and plaintiff has not come forth with any evidence of pretext in rebuttal. Again, plaintiffs own subjective belief or conjecture that defendant's reasoning is pretextual is insufficient to carry her burden and overcome defendant's motion for summary judgment on this issue. *Branson,* 853 F.2d at 772.

### 3. Termination

■ Plaintiff complains that defendant terminated her, ostensibly for insubordination, but actually because of national origin. In support of this claim, she asserts that she was not insubordinate and that, even if she was insubordinate, two white employees—Cooley and Kline—were not terminated for acts of comparable seriousness.

After defendant has offered evidence that it terminated plaintiff for a legitimate, nondiscriminatory reason, such as insubordination, plaintiff must have a "full and fair opportunity to demonstrate that the defendant's proffered reason was pretextual." *MacDonald v. Eastern Wyoming Mental Health Center,* 941 F.2d 1115, 1119 (10th Cir.1991).

Defendant's evidence of insubordination is strong. Slover and Fisher—management representatives who were present at the counseling session for Kline—agree that plaintiff was insubordinate. Plaintiff herself admits that she said that she would show Fisher some respect when she got some respect and that she told Slover and Fisher in Kline's presence that their counseling of Kline was inappropriate. Nonetheless, plaintiff maintains that she was not insubordinate, and Kline supports plaintiffs characterization of the meeting. Therefore plaintiff has presented evidence that she was not insubordinate during Kline's counseling session, and it is not the Court's function to weigh the evidence at this point. To avoid summary judgment, a plaintiff need not demonstrate that discriminatory reasons motivated the employer's decision to terminate her; she need only demonstrate a genuine dispute of material fact as to whether the proffered reasons

were unworthy of belief. *Randle,* 69 F.3d at 451–52. Viewing the facts in the light most favorable to plaintiff, the Court finds that the trier of fact might reasonably conclude that defendant's proffered reason for terminating plaintiffs employment was unworthy of belief

### Retaliation

■ Plaintiff claims that in failing to promote her, failing to give her a raise and terminating her employment, defendant retaliated against her for complaining of discrimination against Bank Midwest employees and customers and for filing an EEOC charge of discrimination.

Defendant promoted Cooley to Assistant Branch Manager on November 1, 1995. On or about January 1, 1996, Cooley received a pay raise and plaintiff did not. On or about January 29, 1996, plaintiff complained to management about Cooley's promotion, defendant's failure to promote plaintiff or give her a raise, defendant's failure to give Zanatta a raise, plaintiffs perceptions of discriminatory treatment of the African–American Customer Service Representatives, and discrimination against minority customers of the bank in requiring minimum deposits. On February 11, 1996, plaintiff told management that she had filled out an EEOC complaint. Defendant's decisions to promote Cooley (made on November 1, 1995) and to deny plaintiff a pay raise (made on or about January 1, 1996) cannot be retaliatory because they occurred before plaintiff engaged in protected activity which allegedly prompted the retaliatory acts. Thus, any retaliation claim must relate solely to defendant's decision to terminate plaintiff's employment.

### 1. Retaliation for Protected Activity under Title VII

■ In cases of alleged retaliation, the analysis follows a pattern similar to the burden-shifting analysis discussed above for discrimination claims. In order to establish a claim of unlawful retaliation, plaintiff must demonstrate (1) protected opposition to discrimination or participation in a proceeding arising from discrimination; (2) adverse action by the employer contemporaneous with or subsequent to the protected activity; and

(3) a causal connection between such activity and the employer's action. *Williams v. Rice,* 983 F.2d 177, 181 (10th Cir.1993). If plaintiff demonstrates a prima facie case, the burden of production shifts to defendant to articulate a legitimate, nonretaliatory reason for the adverse employment action. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. Defendant need not prove the absence of retaliatory motive at this point, but only produce evidence which would dispel the inference of retaliation by establishing the existence of a legitimate reason for the action. *Burrus v. United Telephone Co. of Kansas, Inc.,* 683 F.2d 339, 343 (10th Cir.), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982). If defendant does so, the burden shifts back to the plaintiff to show that the articulated reason was a mere pretext for discrimination. *Id.* Plaintiff's burden on this point is not onerous, but not perfunctory. *Morgan,* 108 F.3d at 1323–24. The plaintiff must present evidence that, if the trier of fact finds it credible and the employer remains silent, she would be entitled to judgment as a matter of law. *Id.*

Plaintiff claims that defendant terminated her employment because she complained about discriminatory treatment toward herself and other employees, and because she filed an EEOC complaint. Again, defendant assumes that plaintiff has stated a prima facie case, and the Court does so as well.

Defendant claims that it terminated plaintiff's employment because she acted insubordinately toward Bank Midwest management. Plaintiff claims that she was not insubordinate, and she has presented evidence to support her claims. If a trier of fact were to find such evidence credible and the employer were to remain silent as to the reason for her discharge especially given the temporal chain of events in this case—plaintiff would likely be entitled to judgment as a matter of law. Consequently, summary judgment is inappropriate on plaintiff's retaliation in employment claims.

## 2. Retaliation for Whistleblowing

 Defendant argues that plaintiff's wrongful discharge claim is preempted by the KAAD because the KAA provides an adequate and exclusive remedy for employment discrimination. *See Polson v. Davis,* 895 F.2d 705, 709–10 (10th Cir.1990). However, plaintiff's whistleblowing claim does not fall within the ambit of the KAAD because it does not deal with employment discrimination but with discrimination against bank customers.

 Kansas public policy prohibits terminating an employee in retaliation for the good faith reporting to company management or law enforcement authorities of a serious infraction of rules, regulations or laws pertaining to public health, safety or general welfare, *i.e.,* whistleblowing. *Palmer v. Brown,* 242 Kan. 893, 900, 752 P.2d 685 (1988). To maintain an action under this doctrine, plaintiff must prove that a reasonably prudent person would have concluded that her co-worker or employer was engaged in activities in violation of rules, regulations, or laws pertaining to public health, safety, and the general welfare; that the employer had knowledge of the employee's reporting of such violation prior to the employee's discharge; and that the employee was discharged in retaliation for making the report. *Id.* Defendant does not deny that plaintiff reported to bank management that some of its employees discriminated against customers on the basis of race. Defendant does not deny that such acts, if true, would constitute a serious infraction of laws pertaining to the general welfare.[11] Defendant only denies that it terminated plaintiff in retaliation for making such a report. As discussed above, plaintiff has raised an issue of fact as to defendant's motive for terminating her. Consequently, plaintiff's whistleblower claim cannot be summarily dismissed.

---

11. Neither party has addressed whether an employee who reported to bank management a violation of Regulation DD disclosures alone would fall under the protection of the Palmer whistleblower doctrine. The Court need not decide that issue for purposes of this *Memorandum and Or-* der, but expects that the parties will brief the issue in their trial briefs so that the Court can rule upon it, the parties can present evidence accordingly, and the Court can instruct the jury appropriately.

*Breach of Implied Contract*

Plaintiff alleges that Bank Midwest breached an implied contract of employment, including a covenant that she would not be terminated without just cause. Plaintiff bases this claim on statements contained in Bank Midwest's Employee Handbook and Personnel Policy Manual, on the fact that her January 1996 performance appraisal was satisfactory, and on Bosley's statement at the March 18, 1996, verbal warning meeting that they were going to "start anew."

 Kansas law presumes employment to be at will in the absence of an express or implied contract to the contrary. *Nguyen v, IBP, Inc.,* 905 F.Supp. 1471, 1486 (D.Kan.1995). Whether an implied contract of employment exists depends on the mutual intent of the parties as shown by their acts, circumstances and the inferences reasonably drawn therefrom:

> Where it is alleged that an employment contract is one to be based upon the theory of "implied in fact," the understanding and intent of the parties is to be ascertained from several factors which include written and oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship; the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time the employment commenced.

*Morriss v. Coleman Co.,* 241 Kan. 501, 513, 738 P.2d 841 (1987), quoting *Allegri v. Providence–St. Margaret Health Center,* 9 Kan. App.2d 659, Syl. ¶ 5, 684 P.2d 1031 (1984).

 For an employment contract to exist, there must be *mutual intent* between

the parties to enter into it; an employee's unilateral expectations of continued employment are insufficient to create one. *Panis v. Mission Hills Bank, N.A.,* 60 F.3d 1486, 1492 (10th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1045, 134 L.Ed.2d 192 (1996); *Harris v. Board of Pub. Util.,* 757 F.Supp. 1185, 1190 (D.Kan.1991). Intent is ordinarily a question of fact, and so the existence of an implied contract is usually a matter reserved for a jury's determination. *Nguyen,* 905 F.Supp. at 1486–87. However, summary judgment may be appropriate when the alleged implied contract is based only on plaintiff's unilateral expectation of continued employment or on a unilateral expression in a personnel manual that has not been bargained for. *Id.* (citations omitted).

 Plaintiff contends that defendant promised her that it would only terminate her in certain circumstances enumerated in the Employee Handbook and Personnel Policy Manual and that it breached its promise by terminating her for other reasons.[12] In arguing that no contractual agreement existed in this case, defendant relies on the presumptive at-will relationship of employers and employees under Kansas law and on the express disclaimers of any contractual relationship which both the Employee Handbook and Personnel Policy Manual contain.[13] Plaintiff points out that implied contracts need not be formally or explicitly stated and that the mere existence of a disclaimer clause in an employee manual does not preclude formation of a contract. *See Morriss,* 241 Kan. at 514, 738 P.2d 841.

Plaintiff's reliance on *Morriss* to fend off defendant's summary judgment motion on this issue is misplaced. In *Morriss* the employee handbooks were not provided to employees, and the employer's expressly stated policy was that it only terminated employees

---

**12.** Plaintiff concedes that insubordination was one of the permissible grounds for termination, but asserts that whether she was actually insubordinate remains a question of fact.

**13.** The first page of the Employee Handbook states:

> This handbook is not a contract, and it should not be interpreted by you as a guarantee of employment. The relationship between

the employer and employee is now and has always been an "at will" relationship.

Similarly, the Personnel Policy Manual's Introduction states:

> This manual is not to be construed as an employment contract. The employment relationship between the employer and employee is now and has always been an "at will" relationship.

for "good cause." *See id.* at 503–05, 738 P.2d 841. Here, plaintiff admits—in fact, emphasizes—that the Employee Handbook was distributed to all employees and that she received not only the Employee Handbook, but because she was a supervisor, also the Personnel Policy Manual. The record does not reveal any stated or implied policy to terminate employees only for good cause.

▪ While it is true that a provision disclaiming any intent to create an implied contract is not alone determinative of the existence of a contract, *see id.* at 514, 738 P.2d 841, it is conversely true that the memorialization of policies in an employee handbook or manual may evidence, but does not by itself conclusively prove the parties' intent to be contractually bound by those policies. *See Berry v. General Motors Corp.,* 838 F.Supp. 1479, 1492 (D.Kan.1993), *aff'd,* 56 F.3d 1233 (10th Cir.1995). The ultimate issue is whether the totality of circumstances supports a finding that the parties objectively manifested their intent to alter the at-will employment relationship. *Id.* Plaintiff has presented no evidence of contractual negotiations, expressed intent by either party to alter the at-will relationship, industry practice, conduct of the parties or any other circumstances that would make clear the parties' intent to change the at-will relationship between plaintiff and Bank Midwest. In short, the policies set forth in Bank Midwest's Employee Handbook and Personnel Policy Manual, along with plaintiff's favorable 1996 performance review and Bosley's statement that plaintiff would be starting anew with a new supervisor in March 1996, are simply not enough to support a finding that the parties objectively manifested their intent to alter the at-will relationship presumed by Kansas law and set forth in the Employee Handbook and Personnel Policy Manual.

Because plaintiff has not produced sufficient evidence that defendant's intent was anything other than to circulate non-binding management guidelines and policies that did not alter the at-will employment relationship, her evidence is insufficient to persuade a reasonable jury that a contract of employment in fact existed, and her claim for breach of implied contract cannot survive summary judgment.

*Intentional Infliction of Emotional Distress/Outrage*

▪ Plaintiff claims that for four months—from January 1996 until her termination in April 1996—defendant was seeking grounds on which to terminate her employment and that such conduct was severe enough to cause plaintiff's anxiety attacks. Plaintiff asserts that defendant's actions constitute an ongoing pattern of conduct that warrants imposition of damages for intentional infliction of emotional distress and the tort of outrage.

▪ Under Kansas law, the tort of outrage provides that "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." *Fletcher v. Wesley Medical Center,* 585 F.Supp. 1260, 1261 (D.Kan.1984), *quoting* Restatement (Second) of Torts § 46(1). The cause of action has two critical elements which plaintiff must establish and which the Court must determine to exist before submitting the issue to a jury: (1) whether defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery and (2) whether the emotional distress suffered by plaintiff is so severe that no reasonable person should be expected to endure it. *Roberts v. Saylor,* 230 Kan. 289, 292–93, 637 P.2d 1175 (1981).

Plaintiff attempts to liken her case to two other cases—*Laughinghouse v. Risser* 754 F.Supp. 836 (D.Kan.1990), and *Gomez v. Hug,* 7 Kan.App.2d 603, 645 P.2d 916 (1982)—in which claims of outrage were allowed to proceed past the summary judgment stage. Again, plaintiff's analogies *fall* far from the mark. In *Laughinghouse,* defendant allegedly subjected plaintiff to threats and abusive harassment for two years after she declined to spend the night with him. *Laughinghouse,* 754 F.Supp. at 843. Such harassment and abuse took the forms of screaming, cursing, sexual comments and unwanted touching, fits of rage which included tearing up files and throwing things, threats of termination and other tac-

tics. *Id.* Evidence in that case (not merely plaintiffs own testimony) indicated, among other things, that defendant mounted a concerted effort to terrorize plaintiff and break her spirit and that he treated her "like an animal." *Id.* Similarly, defendant in *Gomez* subjected plaintiff to vulgar and racist invective, threats of violence and possibly assault. *Gomez,* 7 Kan.App.2d at 604–10, 645 P.2d 916.

■ These cases have little in common with plaintiff's situation. To be actionable, defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Roberts,* 230 Kan. at 293, 637 P.2d 1175. In this case, the "extreme and outrageous" conduct of which plaintiff complains turns out to be nothing more than that defendants terminated her employment, ostensibly for legitimate reasons but actually because she was Mexican–American and had complained of discriminatory business practices. Time and time again, courts have held that more must accompany a firing if it is to be deemed "outrageous." *See, e.g., Bolden v. PRC Inc.,* 43 F.3d 545, 554–55 (10th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995); *Higgins v. Johnson Cty. Medical Laboratories, Inc.,* 1996 WL 707102, *6 (D.Kan.1996); *Ellis v. Osco Drug, Inc.,* 1996 WL 432382, *5 (D.Kan.1996); *Fletcher,* 585 F.Supp. at 1262.

Plaintiff has simply failed to identify—let alone produce evidence of—any conduct by defendant that was so outrageous in character or so extreme in degree as to go beyond the bounds of decency or to be regarded as atrocious and utterly intolerable in a civilized society. Accordingly, defendant is entitled to summary judgment on her claim of intentional infliction of emotional distress.

**IT IS THEREFORE ORDERED** that *Defendant's Motion for Summary Judgment* (Doc. # 29) filed February 19, 1997, be and hereby is sustained with respect to plaintiff's claims that defendant discriminated or retaliated against her in failing to promote her and failing to give her a raise; sustained with respect to plaintiff's claim that defendant

breached an implied contract of employment; and sustained with respect to plaintiff's claim that defendant intentionally inflicted emotional distress on her and committed the tort of outrage.

**IT IS FURTHER ORDERED** that *Defendant's Motion for Summary Judgment* (Doc. # 29) filed February 19, 1997, be and hereby is overruled with respect to plaintiff's claim that defendant terminated her employment because of her national origin; overruled with respect to plaintiff's claim that defendant terminated her employment in retaliation for protected activity under Title VII; and overruled with respect to plaintiff's claim that defendant terminated her employment in violation of Kansas public policy for complaining to management of discriminatory banking practices.