**Phillip W. FRYE, Plaintiff,**

v.

**IBP, INC., Defendant.**

**Civil Action No. 97–2447–KHV.**

United States District Court,
D. Kansas.

May 19, 1998.

David W. Hauber, Boddington & Brown, Chtd., Kansas City, KS, for Phillip W. Frye.

Patricia A. Konopka, Kathy Perkins Brooks, Stinson, Mag & Fizzell, P.C., Kansas City, MO, for IBP Inc.

### *MEMORANDUM AND ORDER*

VRATIL, District Judge.

Plaintiff Phillip W. Frye brings this action against his former employer, IBP, Inc., which terminated his employment on September 9, 1996. Plaintiff sues IBP for invasion of privacy, breach of implied contract, and retaliatory discharge. This matter comes before the Court on *Plaintiff's Motion For Partial Summary Judgment* (Doc. # 44) filed February 25, 1998, and *Defendant's Motion For Summary Judgment* (Doc. # 46) filed March 25, 1998. Plaintiff seeks partial summary judgment on his claim that IBP breached an implied contract of employment. IBP claims that it is entitled to summary judgment on all theories of relief. For reasons which follow, the Court finds that plaintiff's motion should be overruled and that IBP's motion should be sustained.

### Factual Summary

The following material facts are undisputed, or where disputed, viewed in the

light most favorable to the party opposing the motion for summary judgment.[1]

IBP, Inc., operates a beef processing facility in Emporia, Kansas, where plaintiff began work on August 16, 1982. On April 8, 1996, IBP promoted plaintiff to lead mechanic on the third shift (10:00 p.m. until 6:30 a.m.). As lead mechanic, plaintiff reported to two slaughter maintenance supervisors who shared responsibility for third shift operations. One of the supervisors was Robert Brown; Carl Cannon held the other position until early 1996, when Ed Rohling assumed it. Mike Fiehler was IBP's Emporia Complex Manager.

At all relevant times, IBP posted a Drug/Alcohol Policy at the Emporia Plant. It provided in relevant part as follows:

> It has always been the objective of IBP to make every effort to provide a safe, clean and wholesome place to work. Each employee, regardless of his/her position in the Company, must accept responsibility to help us achieve this goal. When employees have the presence of illegal drugs or alcohol in their system, they become a safety hazard to themselves and their fellow employees....
>
> **Section III—Drug/Alcohol Screening**
>
> The Company reserves the right to safeguard employees and property by administering an Alcohol/Controlled Substance Screen to any employee:
>
> 1. During their hiring process....
>
> 2. Whenever there is reasonable suspicion that the employee's ability to function safely may be affected by alcohol or drugs.
>
> 3. Involved in a workplace accident which requires a physician's visit.
>
> Failure to submit to a screen or altering a screen in any way will result in disciplinary action up to and including discharge.

According to Fiehler, IBP conducted drug testing only pursuant to this policy. IBP expected employees to comply with the policy, and employees expected IBP to comply with it.

In April of 1996, IBP employees Robert Judd and Paul White contacted Steve Rumbo, a plant security officer. They told Rumbo that White had seen plaintiff and Brown smoking something and, at the same time, smelled marijuana. They also told Rumbo that White had discovered marijuana in the engine room and lift station. Judd reported that while he had not seen plaintiff and Brown smoking, he had observed them in the same area as the marijuana odor at least five times.

Security officers told Fiehler that they had received information that Brown and "the lead man on third shift" (plaintiff) were smoking marijuana on the job. They undertook surveillance in an effort to observe the reported drug use, but they saw nothing.

During late spring/early summer of 1996, Cannon was Brown's counterpart as slaughter maintenance supervisor. At about that time, Jeremy Cooper, a maintenance employee, told Cannon that Brown, plaintiff, and James Bowers (another maintenance employee) had told him that if he did not smoke

---

1. Plaintiff objects that statements which IBP attributes to various persons are hearsay and double hearsay and thus inadmissible for summary judgment purposes. *See Thomas v. International Business Machines,* 48 F.3d 478, 485 (10th Cir. 1995) (inadmissible hearsay evidence "is not suitable grist for the summary judgment mill."). Plaintiff's position is ill-taken, however, because such statements are not offered for the truth of the matter asserted but rather to show the information upon which defendant based its decision to test him for illicit drug use. Rule 801(c), Federal Rules of Evidence; *see Starr v. Pearle Vision, Inc.,* 54 F.3d 1548, 1555–56 (10th Cir. 1995). Furthermore, in several instances plaintiff purports not to controvert IBP's stated facts, but to argue the implications of those facts. We ignore any legal conclusions which plaintiff has asserted as facts. *E.g., Lewis v. Nelson,* 1996 WL 772525, n. 1 (D.Kan. Nov.26, 1996), *aff'd,* 113 F.3d 1246 (1997).

In some respects, plaintiff's response to IBP's motion for summary judgment tends to confuse and complicate the issues, and make more difficult the already arduous task of sorting through the parties' factual allegations. Although the Court has not decided these motions on the basis of either party's failure to comply with D. Kan. Rule 56.1, neither has the Court based its decision on those of plaintiff's "facts" which are immaterial, argumentative, or unsupported by the record. *See, e.g., Schrag v. Dinges,* 150 F.R.D. 664, 680 (D.Kan.1993), *aff'd in relevant part,* 73 F.3d 374 (10th Cir.1995).

marijuana with them, they did not want him on the shift.[2] Cannon had never seen Brown, plaintiff or Bowers in an impaired condition, nor had he questioned their ability to function safely in their jobs. He nonetheless relayed Cooper's information to his own supervisor, Mike McReynolds. Cannon also showed McReynolds some marijuana stems he had found at the lift station. McReynolds in turn relayed the information to Fiehler.

Some time later, Cannon told McReynolds he had heard a rumor that Cooper himself had brought marijuana to work.

One or two weeks after his conversation with Cooper, Cannon told Fiehler that marijuana smoking was definitely going on, because Bowers had admitted smoking marijuana with Brown and plaintiff. In early September, 1996, Cannon learned that plaintiff was planning to bring marijuana back from his vacation. Cannon therefore told Fiehler that if he wanted to catch Brown and plaintiff, this was the time to check them. Fiehler knew nothing about the source of Cannon's information, beyond the fact that Cannon had received the information from another employee. Cannon later told Bowers that he (Cannon) would have to reveal the source of the information which he had given Fiehler. In response, Bowers recanted his story, denying that he ever said anything about drugs.

On September 4, 1996, Fiehler met with Rodger Brownrigg, Plant Personnel Manager, and Gerald Huddleston, Plant Engineer. Fiehler expressed concerns that the highest-ranking supervisor on third shift (Brown) and his assistant (plaintiff) were smoking marijuana at work. He also noted that IBP depended on them to run the plant safely. They therefore decided to test Brown and plaintiff for drugs before the end of their shift on September 5, 1996.[3]

At approximately 6:00 a.m. on September 5, 1996, Huddleston and Brownrigg summoned Brown and plaintiff to the Slaughter Personnel Office. Huddleston told them that he had information that employees were smoking marijuana on shift and that they were implicated. He asked Brown and plaintiff to submit to a urine test, and both agreed.[4] At the time, neither plaintiff nor Brown appeared impaired or glassy-eyed, or had slurred speech. In fact, to Huddleston's knowledge, plaintiff and Brown functioned safely as employees; he had never noticed either to be glassy-eyed or to have slurred speech.

In response to Huddleston's request, plaintiff asked if he could put away his tools, take a shower, and change his clothes before giving the sample. Huddleston and Brownrigg agreed. Brown went directly to the dispensary, where he gave a urine sample at about 6:30 a.m. Huddleston told Brown that IBP suspected he and plaintiff were smoking marijuana and if it was true, he needed to let the company know. According to Huddleston,

---

2. Between March 1996 and June 1996, Cooper was having performance problems for which he received discipline on four occasions and a suspension on one occasion. Because he was Cooper's supervisor, Brown was involved in some of these disciplinary actions. Cooper was "scared for his job" at the time he made the report about plaintiff and Brown, and thought plaintiff and Brown were out to get him. Brown's involvement in the disciplinary actions could have given Cooper a motive to retaliate against Brown—a possibility that IBP did not consider before it fired plaintiff. Even if Cooper falsified his report to Cannon, however, the record reveals no evidence that IBP believed (or should have suspected) that Cooper's report was false.

3. According to Fiehler, IBP does not automatically disqualify employees who smoke marijuana outside work; if an employee smokes marijuana off premises, it does not concern him unless it could impair the employee's work habits or create a danger to the employee or others. Fiehler determines when an employee is impaired by observing his actions, his eyes, his speech, how he carries out his job, and whether his personality and behavior are normal.

4. In an attempt to create a factual dispute whether he *agreed* to the drug test, plaintiff cites his deposition testimony, which indicates that IBP asked or told him to submit to a drug test, and that this humiliated him. Plaintiff also cites IBP's drug testing policy, which according to plaintiff provides that refusal to submit to a drug screen shall result in discipline. Plaintiff cites no other evidence that he did not voluntarily provide a urine sample. Moreover, although it is undisputed that plaintiff provided a urine sample, IBP disagrees that it was plaintiff's own urine. Accordingly, there remains a question of fact whether plaintiff even submitted to the drug test.

Brown stated he was not going to lie and admitted that he had smoked marijuana.[5] Huddleston asked Brown if plaintiff had ever smoked marijuana. Brown replied that he had no comment. Huddleston gave Brown the option of resignation or termination, and Brown resigned.

Plaintiff reported to the dispensary at about 6:45 a.m., and provided a urine sample in the privacy of a restroom. After the test, Huddleston told plaintiff that IBP suspected him of smoking marijuana with Brown and asked if it was true. Plaintiff denied that he smoked marijuana at work and—because his shift was over—left the plant. Plaintiff retained an attorney, probably later that day.

On September 6, 1996, Ray Smith, a third shift maintenance mechanic, told his supervisor that on the morning of September 5, Bowers had asked him to urinate in a bag. Bowers told Smith that if he did not comply, someone was going to be fired. When Smith asked who he was talking about, Bower replied "Phil and Deadeye."[6] Smith told his supervisor that he had provided the urine sample and that during his shift on the evening of September 5, plaintiff had thanked him—stating "I knew I couldn't pass that test."[7] Smith's supervisor immediately notified Fiehler, who relayed the information to Brownrigg. IBP management believed that Smith was telling the truth.[8] Brownrigg asked the plant nurse whether there had been anything peculiar about plaintiff's test, and she indicated that the urine sample was "towards the lower part of the [temperature] level."

Based primarily on Smith's report, IBP decided to test plaintiff again. At the end of his shift on September 9, 1996, plaintiff's

shift supervisor took him to meet Brownrigg. Brownrigg told plaintiff that he wanted to conduct another test. Plaintiff delayed his decision for a considerable period of time, drinking several glasses of water and asking to consult with his attorney. Brownrigg did not want to let plaintiff out of his sight, given the report that he had provided a false sample in the first test. Brownrigg therefore allowed plaintiff to make a telephone call but would not let him leave the plant to meet with counsel. Brownrigg told plaintiff that he would terminate his employment if plaintiff refused to submit to the drug test.[9] Eventually plaintiff refused to do so and Brownrigg fired him. According to Brownrigg, IBP does not fire probationary or regular employees without some just cause basis.

Plaintiff admits that IBP asked him to provide a urine sample on September 9, 1996, and that he said he would do so only if IBP allowed him to leave to consult with his attorney and if his attorney instructed him to do so. Plaintiff also admits that he understood IBP would terminate his employment if he left without providing a sample. After he fired plaintiff, Brownrigg met separately with Smith and Bowers. Smith confirmed his earlier story that he had provided plaintiff's counterfeit sample. Bowers continued to deny any involvement, but Brownrigg believed that Bowers was lying and that Smith was telling the truth.

Plaintiff filed a claim for unemployment compensation, which he received after a hearing on appeal. IBP's position at the hearing was that it had given plaintiff a drug test on September 5, 1996 because it suspected him of smoking marijuana at work; that it fired plaintiff for refusing to provide a second

---

5. IBP claims that Brown also admitted smoking marijuana on company property, an allegation that Brown denies.

6. Brown's nickname is "Deadeye."

7. Plaintiff denies making this statement to Smith.

8. Plaintiff seeks to create a genuine issue of fact whether Smith truthfully reported that the urine sample was his and not plaintiff's. *See Plaintiff's Response In Opposition To Defendant's Motion For Summary Judgment* (Doc. # 51) filed March 13, 1998, pp. 14–19, ¶ 19. Although plaintiff succeeds in creating a genuine issue of fact

whether Smith had a *reason* to lie, he has no evidence that Smith did not make the statements to his supervisor, or that IBP did not believe he was truthful.

9. According to plaintiff, Brownrigg stated at one point that if plaintiff did not provide the urine sample, IBP would place plaintiff on indefinite suspension. Plaintiff responded that he felt Brownrigg would try to prevent him from obtaining unemployment compensation by putting him on indefinite suspension rather than terminating his employment.

sample; and that a second sample was appropriate because IBP suspected plaintiff of tampering with the first. Plaintiff is not aware that IBP communicated information about his termination, or the alleged falsification of his drug test, to anyone outside of IBP.[10] No one contacted IBP about a job reference for plaintiff and in any event, IBP's policy is to provide only hire dates, termination dates and sometimes wages. On written job applications, plaintiff stated that he had left IBP due to "wrongful discharge," without describing the circumstances. Plaintiff claims that IBP compelled him to disclose further information in job interviews, but he participated in only three interviews. One of those employers offered him a job, which he started on December 2, 1996.[11] Plaintiff withdrew his application from the second employer and the third did not call him back.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of*

*Watonga,* 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l. Inc. v. First Affiliated Securities, Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics,* 912 F.2d at 1241.

"[W]e must view the record in the light most favorable to the parties opposing the motion for summary judgment." *Deepwater Investments, Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 793 (10th Cir. 1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson* at 251–52, 106 S.Ct. 2505. Ever mindful of these summary judgment standards, the Court now turns to the merits of the parties' motions.

### Analysis

■ Plaintiff alleges violations of state law. Because this Court's subject matter

---

10. In an attempt to create a genuine issue of fact, plaintiff notes that Smith, Bowers, Brown, and another unidentified IBP employee heard about the results of the drug tests, "indicating that someone had leaked the information about drug testing" and that "there is no telling where the information has gone." These arguments, without more, do not create a genuine issue of fact whether defendant IBP communicated information about his termination or falsification of a drug test outside IBP.

11. Plaintiff provided a urine sample for a drug test for his current job. In his deposition testimony, plaintiff drew a distinction between providing a urine sample for a new job, which he said he understood, and IBP's demand that he provide a sample after working for IBP for fourteen years, which humiliated and degraded him. (Deposition of Phillip Frye, December 4, 1997, pp. 106–07).

jurisdiction is grounded in diversity, we apply the substantive law of Kansas, the state whose law governs this action. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Our task is to ascertain and apply state law with the objective that the result obtained in this federal court be the result that would be reached in the state court. *Adams–Arapahoe Sch. Dist. v. GAF Corp.,* 959 F.2d 868, 870 (10th Cir.1992).

## I. Invasion of Privacy

■ Kansas law recognizes claims for invasion privacy in the forms of the four tort theories set forth in the Restatement of Torts (Second) §§ 652B–652E (1977). *Ali v. Douglas Cable Communications,* 929 F.Supp. 1362, 1381 (D.Kan.1996); *Froelich v. Adair,* 213 Kan. 357, 358, 516 P.2d 993, 996 (1973). In this case, plaintiff brings claims of intrusion upon seclusion and publicity placing him in a false light.

### A. Intrusion Upon Seclusion

■ The tort of intrusion upon seclusion requires plaintiff to show that IBP intentionally intruded on his solitude, seclusion, or private affairs or concerns, and that the intrusion would be highly offensive to a reasonable person. *Ali,* 929 F.Supp. at 1381; Restatement (Second) of Torts § 652B (1977). "The interference must be 'a substantial one, of a kind that would be highly offensive to the ordinary reasonable person, as the result of conduct to which the reasonable person would strongly object.' " *Ali,* 929 F.Supp. at 1382 (citation omitted). To be liable for intrusion upon seclusion, IBP must " 'place [it]self physically, or by means of [its] senses, within plaintiff's zone of privacy.' " *Id.; Finlay v. Finlay,* 18 Kan.App.2d 479, 486–87, 856 P.2d 183, 189, *rev. denied,* 253 Kan. 857 (1993). Plaintiff must show that both the manner of the intrusion and the nature of the information sought rise to the level of being highly offensive to a reasonable person. *Ali,* 929 F.Supp. at 1382; *Froelich,* 213 Kan. at 360, 516 P.2d at 993. The Kansas courts have not applied § 652B to employer drug testing policies and procedures, so the case is apparently one of first impression.

IBP insists that it is entitled to summary judgment on this issue because as a matter of law, the events of September 5 and September 9 will not support a claim for intrusion upon seclusion. Specifically, IBP argues that plaintiff voluntarily submitted to the first test and that he therefore cannot claim any invasion of his privacy for that event. Furthermore, IBP argues that neither the manner nor the purpose of the drug test can be reasonably construed as highly offensive to a reasonable person. Finally, IBP argues that because plaintiff did not submit to its request for a test on September 9, the events of that date did not intrude on plaintiff's privacy.

Plaintiff claims that IBP intruded upon his seclusion by twice requesting that he submit to urinalysis drug tests while he was in IBP's employ. According to plaintiff, "IBP's improper use of drug testing and even the request to use drug testing on September 5 and September 9, 1996, constituted an intrusion upon seclusion of plaintiff's physical privacy and personal solitude." Plaintiff's arguments on this issue are somewhat confusing. He asserts that "[c]ompelling one to submit to an [sic] urinalysis test, under penalty of discipline or discharge, clearly is a substantial intrusion and one that is highly offensive to a reasonable person," that "drug testing of any kind is an intrusion into a person's private life," and that "when an employer drug tests, it automatically impinges upon an employee's right to privacy." At the same time, he says that he does not challenge IBP's right to enact a drug testing program or the drug testing policy which IBP has enacted. Plaintiff also argues that IBP was not interested in whether he had used illicit drugs, but instead sought to use the drug test as a "lie detector" to confirm or dispel rumors concerning drug use.

According to plaintiff, however, this case presents the narrow issue "whether an employer, which compels an employee to submit to a drug screen, outside the scope of its policy, or face termination, necessarily intrudes upon that employee's right to be left alone." Thus, the essence of plaintiff's challenge appears to be that IBP did not follow its drug testing policy, in that it compelled

plaintiff to submit to a drug test without a sufficiently reasonable suspicion that his ability to function safely was affected by drug use. According to plaintiff, IBP relied upon hearsay, rumor, and speculation, which was legally insufficient to establish "reasonable suspicion" under its policy.

■■■ Despite plaintiff's argument that drug tests automatically impinge upon an employee's right to privacy, the State of Kansas clearly recognizes employer policies which require drug testing as a condition of employment. *See, e.g.,* K.S.A. § 44–706(b) (discussing what constitutes employee misconduct for purpose of unemployment benefits). Furthermore, plaintiff's subjective reaction to IBP's conduct—which was allegedly one of extreme upset and humiliation—is not dispositive on the intrusion upon seclusion issue; the reasonable person standard is an objective one. *E.g., Lane v. Random House, Inc.,* 985 F.Supp. 141, 148–49 (D.D.C.1995) (under false light invasion of privacy claim, whether reasonable person would find conduct "highly offensive" is objective standard). To resolve this issue, we must determine whether a reasonable person would be highly offended by IBP's conduct and the information which it sought, and whether plaintiff's consent to the test bars him from proceeding on this claim.

IBP cites authority for the proposition that consent to a drug test obviates any claim for invasion of privacy. IBP relies heavily on *Luedtke v. Nabors Alaska Drilling, Inc.,* 768 P.2d 1123 (Alaska 1989), in which the Alaska Supreme Court held that an employee's voluntary submission to employer drug testing, as part of a physical examination, prevented him from claiming that the manner of the test was "highly offensive." IBP also cites *Farrington v. Sysco Food Services, Inc.,* 865 S.W.2d 247, 253 (1993), to the effect that drug testing of private sector employees does not amount to a tortious invasion of privacy where the employee consents.[12] Other cases which IBP cites involve employers that discharged employees who refused to submit to drug tests. *E.g., Greco v. Halliburton Co.,* 674 F.Supp. 1447, 1451 (D.Wyo.1987).

IBP argues that plaintiff consented to the request for a drug test because (1) he provided a urine sample when he could have refused, and (2) he worked in a workplace which required drug testing when he could have worked elsewhere. Plaintiff disagrees, arguing that he had no alternative but to submit or be fired, and that his continued employment with IBP does not make his submission voluntary.

■■■ "As with any intentional tort, consent is an absolute defense, even if improperly induced." *Baugh v. CBS Inc.,* 828 F.Supp. 745, 757 (N.D.Cal.1993). *See also Curtright v. Ray,* 1991 WL 179385, at *7 (D.Kan.1991) (defendants' investigation into plaintiff's alleged drinking problem not invasion of privacy under section 652B because plaintiff agreed to investigation and "thus actually opened his personal life to the inspection of others, rather than casting a cloak about his person"); *Farrington,* 865 S.W.2d at 253 (consent is absolute defense to invasion of privacy, even though refusal to consent would result in termination of employment). We agree with IBP that consent to a drug test may be inferred when an employee provides a urine sample upon request and, further, that the inference of consent is not negated by the mere fact that refusal to consent may result in termination or other adverse employment action.[13] We also agree that by accepting employment in a workplace which required drug testing, plaintiff implicitly agreed to comply with IBP policy and protocol on drug testing. *See, e.g., O'Brien v. Papa Gino's of America, Inc.,* 780 F.2d 1067, 1072 (1st Cir.1986) (employee

---

**12.** In the Fourth Amendment context, *see, e.g., Pike v. Gallagher,* 829 F.Supp. 1254 (D.N.M. 1993) (defendant's proof of mere acquiescence by employee to claim of lawful authority—to demand drug test—insufficient to meet strict burden necessary to prove employee waived Fourth Amendment rights).

**13.** If we were to agree with plaintiff that consent is negated when the choice is to give a urine sample or be fired, the Court would essentially hold as a matter of law that any consent in an employment setting is illusory or that the prospect of an adverse employment consequence, barring consent, is sufficient without more to create a genuine issue for trial on the voluntariness of the alleged consent.

contracted away certain rights by accepting employment from employer who forbade drug use, but employer's demand that employee submit to polygraph exceeded scope of employee's consent to allow reasonable investigation into drug use); *Luck v. Southern Pac. Transp. Co.,* 218 Cal.App.3d 1, 267 Cal.Rptr. 618 (despite fact that employee signed form consenting to drug testing, consent was ambiguous and therefore question for jury), *cert. denied,* 498 U.S. 939, 111 S.Ct. 344, 112 L.Ed.2d 309 (1990). We cannot agree, however, that by accepting employment with IBP, plaintiff implicitly agreed to submit to any and all demands that IBP might exact in the drug testing arena. At most, the record supports an inference that consistent with IBP policy, plaintiff consented to undergo an alcohol/controlled substance screen if IBP had a reasonable suspicion that his ability to function safely "may be affected by alcohol or drugs," and that if he failed to submit to a screen or altered a screen in any way, he would be disciplined (up to and including discharge). From this, plaintiff argues (1) that he never consented to drug testing when IBP did not have a reasonable suspicion that his ability to function safely was affected by alcohol or drugs, and (2) that he never consented to repeated testing to determine whether he had in any way altered or substituted a urine sample.

■■■ IBP is not entitled to summary judgment on the consent defense, as it relates to the urine sample which plaintiff provided on September 5, because defendant has not demonstrated as a matter of law that plaintiff consented to drug testing in circumstances where IBP lacked a reasonable suspicion that his ability to function safely was affected by alcohol or drugs. We must therefore address the merit of plaintiff's claim that the nature of the information sought and the manner of IBP's intrusion might reasonably be seen as "highly offensive to a reasonable person."

On these facts, even assuming that IBP violated its policy in demanding a urine sample on September 5 without reasonable suspicion, the Court finds that a reasonable jury would not conclude that plaintiff thereby suffered an intrusion on privacy within the meaning of Section 625B of the Restatement (Second) of Torts. IBP's stated policy is that "[w]hen employees have the presence of illegal drugs ... in their system [sic], they become a safety hazard to themselves and their fellow employees." In view of this policy, and in light of IBP's objective to provide every employee a "safe, clean and wholesome place to work," the nature of the information IBP sought—i.e., whether its lead mechanic on the third shift had been smoking marijuana—was not unreasonable. Moreover, a reasonable jury would not find that IBP acted in a highly offensive manner in collecting that information.[14] In *Borse v. Piece Goods Shop, Inc.,* 963 F.2d 611, 621 (3rd Cir.1992), the Third Circuit noted that if the method used to collect a urine sample fails to give due regard to the employee's privacy—e.g., through use of visual or aural monitoring to prevent tampering—it could constitute a substantial and highly offensive intrusion upon seclusion. See also *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 617, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 660, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). Here, however, plaintiff does not challenge IBP's collection methods. In summary, then, plaintiff has failed to demonstrate that IBP tortiously intruded upon his seclusion on September 5. Plaintiff does not challenge IBP's right to test for drugs, nor does he challenge IBP's drug testing policy. Even if IBP acted on unreliable reports or without objectively reasonable suspicion of drug use by plaintiff, its conduct cannot be seen as "highly offensive" by a reasonable jury.

14. Plaintiff would have us apply the law of cases in which public employer drug testing has been held to violate the Fourth Amendment. In those cases, courts have held that public employers have the burden of establishing that employees freely and voluntarily submitted to a drug test. *E.g., Pike v. Gallagher,* 829 F.Supp. 1254 (D.N.M. 1993). IBP, however, is a private employer and plaintiff cites no authority which mandates application of Fourth Amendment standards in this context. Moreover, plaintiff himself admits that "Fourth Amendment jurisprudence is not at issue here." *Plaintiff's Response In Opposition To Defendant's Motion For Summary Judgment* (Doc. # 51) filed March 13, 1998, at 28.

■ As to the events of September 9, IBP is also entitled to summary judgment. IBP's unavailing request for a second sample simply cannot be viewed as an intrusion—let alone a substantial intrusion—on plaintiff's privacy. *See, e.g., Greco v. Halliburton Co.,* 674 F.Supp. at 1451 (plaintiff could not prove that termination for refusal to submit to urinalysis was invasion of privacy); *Gilmore v. Enogex, Inc.,* 878 P.2d 360, 366–67 (Okla. 1994) (employer did not invade employee's privacy by demanding random drug test); *Jennings v. Minco Technology Labs, Inc.,* 765 S.W.2d 497, 502 (1989) (where employee refused consent to drug test, employer not liable for invasion of privacy); *Gretencord v. Ford Motor Co.,* 538 F.Supp. 331, 333 (D.Kan.1982) (employee who refused to let employer search vehicle could not sue for damages "as a result of an act that did not occur."). *Cf. Borse* 963 F.2d at 626 (firing employee who refused to consent to urinalysis and personal property searches would violate public policy exception to Pennsylvania employment-at-will doctrine if testing program would be tortious invasion of employee's privacy). Because IBP had a legitimate interest in determining whether plaintiff had tampered with the first sample, it had sufficient reason to request that plaintiff provide a second. Nothing in the timing, manner or purpose of its request can be remotely construed as "highly offensive" to an ordinary reasonable person. Accordingly, IBP is entitled to summary judgment on this aspect of plaintiff's claim for intrusion upon seclusion.

B. Publicity Placing Person In False Light

■ In order to prevail on a claim for false light invasion of privacy, plaintiff must establish (1) publication to a third party; (2) that the publication falsely represents plaintiff, and (3) that the representation would be highly offensive to a reasonable person. *Castleberry v. Boeing Co.,* 880 F.Supp. 1435, 1442 (D.Kan.1995). Plaintiff claims that defendant "depicted plaintiff at proceedings before the unemployment referee, as having violated company policy, which was not true," and that he was then "compelled to indicate to prospective employers that he was dis-

charged from his job for refusal to take a drug test which was false." Without conceding the second and third elements, defendant argues that plaintiff cannot meet the first element because there was no "publication" as required for proof of this claim.

■ Courts generally treat false light invasion of privacy claims in the same way that they treat defamation claims. *Booth v. Electronic Data Sys. Corp.,* 799 F.Supp. 1086, 1091 (D.Kan.1992); *see also Rinsley v. Brandt,* 446 F.Supp. 850, 854 (D.Kan.1977), *aff'd,* 700 F.2d 1304 (10th Cir.1983). The difference between defamation and false light claims lies in the expanded publicity requirement. To support a claim for defamation, communication of the allegedly false information to a single third person is sufficient publication. *See Ali,* 929 F.Supp. at 1383.

■ In the context of a false light invasion of privacy claim, however, publication means that "the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Ali,* 929 F.Supp. at 1383; Restatement (Second) of Torts § 652D, comment a; *see also Polin v. Dun & Bradstreet, Inc.,* 768 F.2d 1204, 1206 (10th Cir.1985). Plaintiff must prove "such widespread disclosure of private matters as to constitute publicizing." *Ali,* 929 F.Supp. at 1383; *see also Huegerich v. IBP, Inc.,* 547 N.W.2d 216, 222–23 (Iowa 1996) (evidence that other employees "heard" plaintiff was "fired for speed" insufficient publication for defamation claim). "Thus it is not an invasion of the right of privacy . . . to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons." *Ali,* 929 F.Supp. at 1383; Restatement (Second) of Torts § 652D, comment a. "Publicizing" information, even if private, to employees with a legitimate need to know the information does not constitute widespread disclosure within the meaning of a false light invasion of privacy claim. *Ali,* 929 F.Supp. at 1383.

■ Plaintiff's false light claim, as it relates to communications at the unemployment hearing, fails to meet the publicity

requirement due to lack of widespread disclosure. The hearing was attended only by plaintiff, his lawyer, the administrative hearing officer and IBP management representatives. As a matter of law, statements in the unemployment hearing were not "widely publicized."

Plaintiff's other false light claim—that IBP compelled him to tell prospective employers that he had been fired for refusing a drug test—also fails the publicity requirement. Plaintiff stated on his written job applications that the reason for leaving IBP was "wrongful discharge," but he provided no details. Even assuming that IBP wrongfully discharged plaintiff, this coerced publication did not place plaintiff in a false light, or even in a negative light; on the contrary, it placed *IBP* in a negative light.[15] It was only in job interviews—three in number—that plaintiff described the circumstances of his discharge. As a matter of law, communication to only three prospective employers is not "publicity" which is sufficient to sustain a false light claim. *See Ali*, 929 F.Supp. at 1383. Nor are we persuaded by plaintiff's argument that IBP "clearly" conveyed information "well beyond those who ha[d] a need to know." Without evidence of publication to more than a few individuals, plaintiff cannot demonstrate that IBP communicated false information "to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Ali*, 929 F.Supp. at 1383; Restatement (Second) of Torts § 652D, comment a.

Accordingly, we conclude that IBP is entitled to judgment as a matter of law on plaintiff's claims for publicity placing person in a false light.

## II.   Breach Of Implied Contract

Although Kansas adheres to the employment-at-will doctrine, *Ramirez v. IBP, Inc.*, 913 F.Supp. 1421, 1428 (D.Kan. 1995), it recognizes a limited implied contract exception to the doctrine. *Castleberry v. Boeing Co.*, 880 F.Supp. 1435, 1444 (D.Kan. 1995). Plaintiff argues that the drug testing policy created an implied contract of employ-

ment pursuant to which IBP agreed not to test or fire employees for illicit drug use, except under enumerated circumstances. Plaintiff claims that IBP's demand that he take drug tests on September 5 and September 9 breached the contract because IBP lacked reasonable suspicion that his ability to function safely may have been affected by alcohol or drugs, as required by the terms of the contract. Plaintiff claims that IBP also breached the contract when it fired him for refusing the drug test on September 9, because it did so without reasonable suspicion of impairment. IBP seeks summary judgment on this claim, arguing that the policy was not a contract at all, and that if it was a contract, IBP did not breach it. Conversely, plaintiff argues that he is entitled to partial summary judgment on this claim because as a matter of law, IBP committed "clear abuse and breach of its drug testing policy."

The established rule in Kansas is that intent of the contracting parties is normally a question of fact for the jury, and determination of whether there is an implied contract in employment requires a factual inquiry. *Boyd v. Doskocil Sausage Co.*, 686 F.Supp. 875, 877 (D.Kan.1988); *Morriss v. Coleman Co., Inc.*, 241 Kan. 501, 512, 738 P.2d 841, 848 (1987). This Court has previously noted that summary judgment may be appropriate when plaintiff's unilateral expectation of continued employment, or an unbargained-for, unilateral expression in a personnel manual, is the only basis for the alleged implied contract. *Garcia–Harding v. Bank Midwest, N.A.*, 964 F.Supp. 1492, 1511 (D.Kan.1997); *see also Kastner v. Blue Cross and Blue Shield of Kansas, Inc.*, 21 Kan. App.2d 16, 24, 894 P.2d 909, 916 (1995).

The ultimate issue in determining the existence of an implied-in-fact contract is whether the totality of the circumstances supports a finding that the parties objectively manifested their intent to alter the at-will employment relationship. *Garcia–Harding*, 964 F.Supp. at 1512. The factors to be considered in making such a determination include the understanding and intent of the parties, which are ascertainable from

---

**15.**  *See, e.g., Rinsley*, 700 F.2d at 1304 (truth is      absolute defense to false light privacy action).

written and oral negotiations, the conduct of the parties, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to make clear the intention of the parties at the time the employment relationship commenced. *Anglemyer v. Hamilton Cnty. Hosp.*, 58 F.3d 533, 537 (10th Cir.1995); *Enstrom v. Beech Aircraft Corp.*, 712 F.Supp. 841 (D.Kan.1989); *Morriss*, 241 Kan. at 513, 738 P.2d at 848–49.

The record is devoid of evidence that plaintiff relied on any IBP policy or practice to refrain from firing employees except for good cause or in accordance with stated drug and alcohol policies. Likewise, the record contains no evidence that IBP communicated to plaintiff, at any time during his employment, any policy not to fire employees except for good cause. Plaintiff bases his implied contract claim solely on evidence that the drug policy was posted, that he probably read it, that IBP restricted itself by the policy,[16] and that IBP led employees to believe that it does not fire them except for cause.

IBP argues that plaintiff has presented insufficient evidence of contractual negotiations or other circumstances which would tend to make clear the intent of the parties to change the at-will nature of the employment relationship. According to IBP, the fact that IBP unilaterally adopted a drug/alcohol policy and has a general practice of adhering to it does not transform the policy into a binding contract of employment. *E.g., Berry v. General Motors Corp.*, 838 F.Supp. 1479, 1492 (D.Kan.1993) (recognizing distinct difference between policy which given employer might adopt and sincerely intend to follow, and normally does follow, and binding

contractual duty), *aff'd*, 56 F.3d 1233 (10th Cir.1995). In addition, IBP argues, the mere fact that IBP does not discharge employees without reason, and requires just cause to do so, does not create an enforceable bilateral contract.

■ We agree with IBP's arguments on this issue. At most, plaintiff has demonstrated a unilateral expectation of continued employment. Other than Brownrigg's testimony and plaintiff's claim that he read the policy, plaintiff cites no evidence regarding the parties' intention to modify the at-will nature of plaintiff's employment. As with any other contract, "[t]he formation of an implied contract in Kansas requires a proverbial 'meeting of the minds,'" *Randolph v. Board of Pub. Util.*, 983 F.Supp. 1008, 1016 (D.Kan.1997), and plaintiff presents no evidence of any meeting of the minds. Accordingly, IBP is entitled to summary judgment on plaintiff's claim for breach of an implied contract.

■ Even if plaintiff could prove the existence of an implied contract of employment, plaintiff has not demonstrated a genuine issue of triable fact whether IBP breached it by terminating his employment.[17] IBP's drug testing policy states in pertinent part that IBP reserves the right to test an employee when it has "reasonable suspicion" that the employee's ability to function safely may be affected by drugs, and that failure to submit to a drug test will result in disciplinary action "up to and including discharge." As noted above, plaintiff's challenge to the events on September 5 and September 9 focuses on whether defendant had that "reasonable suspicion" which the policy requires.[18]

---

**16.** Whether IBP restricted itself by the policy is not so much a matter of evidence as a matter of argument by plaintiff.

**17.** Plaintiff originally claimed that IBP breached the contract not only by firing him on September 9, but also by demanding the first urine sample on September 5. At the status conference on May 13, 1998, however, plaintiff's counsel conceded that the first breach of contract, if it occurred, is moot. Plaintiff suffered no damages on account of that breach and the Court does not address it further.

**18.** Plaintiff argues that IBP's policy does not authorize a repeat drug test, even if necessary to determine whether an original urine sample has been substituted or tampered with, unless IBP also has "reasonable suspicion" that the employee's ability to function safely may be affected by drugs. If plaintiff's position on this issue is correct, IBP had neither the right nor the obligation to demand a drug test to verify sample tampering and it could terminate plaintiff's employment under the policy—with or without a drug test—if it believed that he had altered a drug screen in any way.

A recent Tenth Circuit case, *Anderson v. Exxon Coal U.S.A. Inc.*, 110 F.3d 73 (table; available in Westlaw at 1997 WL 157378) (10th Cir.1997), addressed a similar factual situation. There, plaintiff claimed breach of an implied contract which authorized employee drug testing "where cause exists to suspect alcohol or drug use." 1997 WL 157378, at *6. The jury found that plaintiff's employer had breached the contract, and the Tenth Circuit reversed. In doing so the court analyzed the contract language which required "cause to suspect" drug use. "Suspicion," the Tenth Circuit said, "must be accorded its common meaning in ordinary parlance which, according to the dictionary, includes doubt, mental uneasiness and uncertainty, or to imagine one to be culpable without proof or with a slight touch or trace of proof." *Id.* It went on to say that such a definition establishes "an extremely low threshold for 'cause,' understandably so where drug use is concerned." *Id.* The Tenth Circuit in *Anderson* then looked at the evidence and concluded that "cause to suspect" drug use existed in that case. The employer had received four names, including plaintiff's, in a report about drug use at its mine; it had no reason to disbelieve the information; it had no contractual duty to make a further investigation; and it tested all of the employees mentioned.

Similarly in this case, IBP received reports that Brown and plaintiff were smoking marijuana at its plant; IBP's agents did not disbelieve the information; nothing in its drug policy imposed on IBP a duty of further investigation; IBP tested Brown; and IBP sought to test plaintiff. Plaintiff insists that IBP's information was unsubstantiated hearsay but the record reveals no genuine dispute about the fact that IBP in fact had doubt, mental uneasiness, and uncertainty whether plaintiff was able to safely perform his job, on account of reports that he was involved in drug use at the plant.[19] Thus plaintiff cannot establish that defendant breached the terms of its policy, if indeed it was a contract, when it fired plaintiff for failing to give the sample requested on September 9.

## III. Retaliatory Discharge

As noted above, Kansas employment law is grounded in the doctrine of employment-at-will. In the absence of an express or implied contract of duration or limiting reasons for discharge between the employer and employee, employment is terminable at the will of either party. *Ramirez*, 913 F.Supp. at 1428. An employer may discharge an employee-at-will for good cause, for no cause, or even for bad cause, without incurring legal liability. *Id.; Morriss*, 241 Kan. at 508, 738 P.2d 841.

In order to prevail on his retaliatory discharge claims, and overcome the employment-at-will doctrine, plaintiff must demonstrate either (1) that Kansas courts have recognized his retaliatory discharge claims as exceptions to the employment-at-will doctrine, or (2) that the conduct on which his retaliatory discharge claims are based is protected by Kansas public policy and no alternative state or federal remedy exists. *Butler v. City of Prairie Village*, 961 F.Supp. 1470, 1474 (D.Kan.1997). Kansas courts have construed narrowly the public policy exceptions to this doctrine. *See Pierce v. Engle*, 726 F.Supp. 1231, 1235 (D.Kan.1989) (applying Kansas law). The two exceptions that Kansas courts have recognized are (1) where an employer discharges an employee for exercising rights under the workers' compensation laws; and (2) where an employer discharges an employee for a good faith report or threat to report a serious infraction of rules, regulations, or law pertaining to the public health, safety and the general welfare by a coworker or employer (i.e., "whistleblowing"). *Ali*, 929 F.Supp. at 1387. Plaintiff invokes neither of these exceptions. Rather, he seeks to exonerate public policies that allegedly protect (1) an employee's right to consult with counsel before consenting or agreeing to a private employer drug test; (2)

---

**19.** As noted above, plaintiff would have us apply the law of cases in which public employer drug testing has been held to violate the Fourth Amendment. The "reasonable suspicion standard" from those cases simply has no place in this civil action. *See Anderson*, 110 F.3d 73, 1997 WL 157378, at *6 ("Suspicion in this civil contract setting does not relate to Fourth Amendment standards.").

an employee's right to be protected from threatened invasions of privacy "without legal justification"; and (3) an employee's right to accuse an employer of trying to deprive him of unemployment compensation benefits, without being fired.

Plaintiff acknowledges that Kansas courts have not recognized any such public policies, and we can find no authority for the proposition that they are recognized (or should be recognized) as exceptions to the doctrine of employment-at-will under Kansas law. Plaintiff relies solely on cases which involve adverse employment action in retaliation for the exercise of workers' compensation rights or for whistleblowing. *See, e.g., Brigham v. Dillon Cos.*, 262 Kan. 12, 935 P.2d 1054 (1997) (recognizing cause of action for retaliatory demotion for asserting workers' compensation rights); *Murphy v. City of Topeka–Shawnee County Dept. of Labor Services*, 6 Kan.App.2d 488, 630 P.2d 186 (1981) (workers' compensation); *Palmer v. Brown*, 242 Kan. 893, 752 P.2d 685 (1988) (whistleblowing). To permit plaintiff's retaliatory discharge claims to proceed, we would have to recognize new public policy exceptions to the Kansas employment-at-will doctrine. We are not inclined to do so in the absence of a more definitive statement from Kansas courts or the Kansas legislature. *Butler*, 961 F.Supp. at 1474; *Collins v. Old Republic Title Co. of Kansas City*, No. 96–2246, 1996 WL 439295, at *3 (D.Kan. Jul.10, 1996). IBP is therefore entitled to judgment as a matter of law as to plaintiff's claims for retaliatory discharge.

**IT IS THEREFORE ORDERED** that defendant's *Motion For Summary Judgment* (Doc. # 46) filed March 25, 1998, be and hereby is **SUSTAINED.**

**IT IS FURTHER ORDERED** that *Plaintiff's Motion For Partial Summary Judgment* (Doc. # 44) filed February 25, 1998, be and hereby is **OVERRULED.**